[Civ. No. 19578. Second Dist., Div. Three. Nov. 23, 1953.]

HOLLYWOOD WHOLESALE ELECTRIC COMPANY (a Corporation), Appellant, v. JOHN BASKIN, INC. (a Corporation) et al., Respondents.

Forster & Gemmill and John G. Gemmill for Appellant.

Glen Behymer, as Amicus Curiae on behalf of Appellant.

Wallace & Cashin and W. W. Wallace for Respondents.

VALLÉE, J.—Appeal by plaintiff from an adverse judgment in an action on a labor and material bond.

The action is against Jack Baskin, Inc., as principal, and Seaboard Surety Company, as surety, on a labor and material bond executed and filed as required by section 4200 of the Government Code, to recover the reasonable value of electrical materials alleged to have been furnished for and used in the construction of school buildings at the Colfax Avenue School site in Los Angeles. In the alternative, plaintiff sought recovery on a second bond filed by Baskin with the school board under the provisions of section 1184d of the Code of Civil Procedure, to secure a release of the moneys payable to it as contractor for the construction of the school buildings after plaintiff had filed its claim with the school board.

On June 19, 1950, Baskin entered into a contract with Los Angeles City School District for the construction of buildings at the Colfax school site. In accordance with the requirements of section 4200 of the Government Code, Baskin, as principal, and Seaboard, as surety, executed and filed a labor and material bond. On the same day Baskin entered into a contract with one W. C. Scruggs, doing business as Scruggs Electrical Company, for the furnishing and installation of the electrical materials in the construction of the Colfax school, for the sum of $14,850.

Plaintiff was engaged in business as a supplier of electrical materials and had done business with Scruggs for many years. Scruggs testified he ordered the greater portion of the electrical

equipment used in the performance of the subcontract from plaintiff. On June 28, 1950, the date of the first purchase of material by Scruggs from plaintiff for use in the Colfax job, Scruggs was indebted to plaintiff in the amount of $14,758.33 for materials previously furnished by plaintiff to Scruggs for other jobs. Thereafter and until May 2, 1951, plaintiff sold and delivered to Scruggs various electrical materials to be used in the Colfax job and for other jobs.

Each order placed by Scruggs was entered by plaintiff on a five-part multicopy invoice form on which was listed a description of the materials embraced in the order and the name of the job for which the materials were ordered and delivered, ''Colfax Avenue School,'' or ''Colfax School.'' One copy of the multi-copy form went to plaintiff's shipping department. Two copies were delivered with the material, one of which was left with the material, and the other was returned to plaintiff with the signature of the party receiving the material at the job site. One copy was sent to the customer as a billing, and the other retained by plaintiff. Two truck drivers of plaintiff testified they had made deliveries for plaintiff to Scruggs at the Colfax school. Plaintiff introduced in evidence the copies of the multicopy form returned to plaintiff with the signatures of the parties receiving the materials at the job site pertaining to the Colfax job. Scruggs identified 12 different signatures on 12 separate delivery receipts as those of his employees. Scruggs testified: he received invoices through the mail from plaintiff concerning each order he had placed with it for the job; with the exception of a few odds and ends all the material invoiced to him for the Colfax school job was actually used on that job; a few small scrap pieces were not used on the job and were credited into his warehouse.

Plaintiff posted the dollar amount of every order placed by Scruggs on general ledger sheets designated ''W. C. Scruggs.'' These entries included orders for the Colfax job as well as orders for other jobs placed by Scruggs during the same period. Every entry of a charge on the ledger sheets contained the date and invoice number of the invoice covering the particular charge. Plaintiff credited Scruggs for materials that he returned on the general ledger sheets. Every credit entry contained a credit memorandum number, which in turn listed the particular job to which the credit was applicable. The general ledger up to December 29, 1950, was a composite of all the various job accounts and obligations. Monthly statements were sent by plaintiff to Scruggs. The statements were

typed at the same time the ledger sheets were prepared by sliding the statement form over the ledger card. They were identical. The original copy of the statement was mailed to Scruggs and the ledger sheet was retained in plaintiff's file.

During the period of performance of the Colfax contract, and particularly from June 28, 1950, to December 29, 1950, several payments were made by Scruggs to plaintiff. They were as follows:

| | |
|---|---:|
| July 31, 1950 | $ 2,280.13 |
| August 17, 1950 | 2,000.00 |
| August 31, 1950 | 2,000.00 |
| September 15, 1950 | 2,690.75 |
| September 29, 1950 | 3,131.52 |
| November 14, 1950 | 2,428.78 |
| November 24, 1950 | 2,406.02 |
| | $16,937.20 |

The November 24th payment was designated for application, and applied by plaintiff, on obligations other than those related to the Colfax job. Except for this one earmarked payment, Scruggs did not request plaintiff to apply any of the other payments to any specific job. The payment of July 31st bore the notation "April Statement"; the payment of August 17th, the notation "On Account May"; the payment of September 15th, the notation "On A/C"; the payment of September 29th bore no notation. None of the checks representing the other payments bore any notation other than "On account." Every payment was recorded on the general ledger sheets.

As of December 29, 1950, plaintiff broke down the sum total of the obligations owing by Scruggs, including the then balance on the Colfax job, segregating them to the various jobs to which they were applicable. This was accomplished through the use of the multiform invoices. All of the invoices from the Scruggs' file were pulled and sorted by jobs. Plaintiff set up a separate ledger sheet for each job then either in progress or current, and transferred the appropriate amount to each job. Immediately prior to the establishment of separate ledger sheets for each job, the general ledger sheet showed a running balance of $34,603.04; this was an increase of $19,844.71 from the balance of $14,758.33 of June 28, 1950. As of December 29, the total value of materials delivered to the Colfax job was $7,992.68, which sum was transferred to the ledger sheet for that specific job. Therefore, during the

six months' period, Scruggs had become additionally indebted to plaintiff for the difference of $11,852.03 ($19,844.71 — $7,992.68) on account of jobs other than the Colfax obligation.

When plaintiff broke down the obligations according to jobs, it prepared a summary statement showing the monthly purchases for each job, and applied credits of cash and collateral (a $6,000 note) to the accounts oldest in time of maturity. It also prepared a ledger recap showing the debits and credits for certain periods. On May 10, 1950, there was an accrued open balance of $20,414.20 owing by Scruggs to plaintiff. The recap showed that cash payments of June 21st and 28th, totaling $8,311.80, not in dispute; and the payments, which are in dispute, of July 31st, $2,280.13, August 17th, $2,000, August 31st, $2,000, September 15th, $2,690.75, and September 29th, $3,131.52—erased this debit to zero.

In segregating the various accounts, plaintiff in effect applied the payments made by Scruggs listed above to the oldest obligations—that is, the obligations owed by Scruggs to plaintiff on the date when plaintiff commenced to furnish materials for the Colfax job.

After December 29, 1950, all purchases made for the Colfax job and all payments made on that job by Scruggs were entered on the ledger sheet for that specific job.

Plaintiff ceased furnishing electrical materials to Scruggs on May 2, 1951. Prior to May 17, 1951, defendant Baskin completed performance of its contract. On May 17th, the Board of Education declared the contract completed and the buildings accepted. Plaintiff demanded of defendants Baskin and Seaboard the payment of the balance due for materials furnished to Scruggs for the Colfax job. Defendants refused to pay.

Plaintiff alleged it furnished Scruggs electrical materials for use in and used in the construction of the Colfax job of the value of $9,836.70; that no part thereof had been paid except the sum of $1,699.99; by the terms of sale Scruggs agreed to pay for the materials on or before the tenth of each month following the month of delivery, plus interest thereon at the rate of 8 per cent a year on amounts due and unpaid for more than 30 days; by the terms of the labor and material bond filed by defendants, the court was to fix a reasonable attorney's fee in case suit was brought on the bond. The prayer was for $8,136.71, together with interest and attorneys' fees.

Defendants alleged that all materials sold by plaintiff to Scruggs, which were used in the construction of the Colfax

school, had been paid for by Scruggs. Defendants introduced in evidence three cancelled checks, showing payment by Baskin to Scruggs of the following amounts on the following dates:

September 9, 1950 .....................$3,000.00
October 10, 1950 ...................... 2,000.00
November 9, 1950 ...................... 3,048.65

A fourth check for $1,500 made jointly to Scruggs and plaintiff, was given by Baskin to Scruggs on December 31, 1950. Plaintiff received it on January 22, 1951, and credited it to Scruggs on the Colfax job. Plaintiff conceded that it was given and received as a payment on that account.

Scruggs testified that the Baskin checks of September 9th, October 10th, and November 9th were received by him on account of his contract for the electrical work on the Colfax job. However, the record is void of any evidence that plaintiff knew Scruggs had received any payments from Baskin other than the check of December 31, 1950. Defendants did not produce Scrugg's bank statement to support their contention that the payments by Scruggs to plaintiff had their source in payments from Baskin to Scruggs.

The court found: Scruggs purchased from plaintiff certain electrical materials used by Scruggs in the performance of his contract, which materials were "called for by the plans and specifications and used in the construction of the building erected by defendant Jack Baskin, Inc. for the School District"; Scruggs paid plaintiff the reasonable value of all of the materials used by Scruggs in the construction of the school; plaintiff sold materials to Scruggs on one open account and the materials were charged on this open account; Scruggs was indebted to plaintiff on one obligation only, the open account; all payments made by Scruggs to plaintiff were credited on the open account; materials not used and returned by Scruggs were credited on the open account; there was no application by either Scruggs or plaintiff as to any payment of money made by Scruggs to plaintiff, but all of said payments were credited to the open account.

The court also found that Baskin paid Scruggs the full selling price and Scruggs paid plaintiff the full selling price for the materials used in the construction of the building, and that plaintiff had been fully paid for all of the materials. Judgment was for defendants. Plaintiff appeals.

Plaintiff's principal ground for reversal is that the finding that plaintiff had been fully paid for all of the materials it

furnished and which were used by Scruggs in the Colfax job is not supported by the evidence. We have concluded the contention must be sustained.

 Where the plaintiff has proven the creation of a debt within the period of the statute of limitations, the burden is on the defendant to prove payment. (20 Cal.Jur. 952, § 30.)

 The defense of payment is affirmative and is never established by mere proof that the claimant has received money. The proof must go further and establish that the money so received can be applied in discharge of the debt or obligation sued upon. (*Bay Lbr. Co.* v. *Pickering,* 120 Cal.App. 163, 169 [7 P.2d 371].)

Defendants base their defense of payment on the premise that the moneys received by plaintiff from Scruggs had their source in the payments from defendant Baskin to Scruggs; therefore, they say the moneys given plaintiff by Scruggs were in settlement of the Colfax school account and plaintiff had been paid in full on this account. Plaintiff does not deny the payments from Baskin to Scruggs; but because Scruggs did not designate to which obligations he wanted the payments of September 15th, September 29th, and November 14th, made by him to plaintiff, applied, it contends that section 1479 of the Civil Code compels application of such payments to those obligations that had arisen prior to June 28th, and not to the Colfax school account.

Section 1479 of the Civil Code provides: "Where a debtor under several obligations to another, does an act, by way of performance, in whole or in part, which is equally applicable to two or more of such obligations, such performance must be applied as follows:

"One. (*Application by debtor.*) If, at the time of performance, the intention or desire of the debtor that such performance should be applied to the extinction of any particular obligation, be manifested to the creditor, it must be so applied.

"Two. (*Application by creditor.*) If no such application be then made, the creditor, within a reasonable time after such performance, may apply it toward the extinction of any obligation, performance of which was due to him from the debtor at the time of such performance; . . .

"Three. (*Application in absence of designation.*) If neither party makes such application within the time prescribed herein, the performance must be applied to the extinction of obligations in the following order; and, if there be more

than one obligation of a particular class, to the extinction of all in that class, ratably:

"1. Of interest due at the time of the performance.

"2. Of principal due at that time.

"3. Of the obligation earliest in date of maturity. . . ."

Defendants claim that Scruggs had only one obligation to plaintiff—his open account—and that the monthly statements mailed to Scruggs reflected only one open account; therefore, section 1479 is not applicable. They rely on *Hammond Lbr. Co.* v. *Henry*, 87 Cal.App. 231 [261 P. 1027].

In *Hammond Lbr. Co.* v. *Henry*, the defendant was a general contractor and builder and at different times had bought building material from the plaintiff. It was the custom of the defendant and the plaintiff to keep a separate account for each building. The plaintiff brought an action pleading three counts: the first, for goods sold and delivered; the second, on an open book account; the third, on an account stated between the parties. The defendant contended that the credits had been improperly applied. It appeared that the plaintiff had applied payments as directed by the defendant at the time of payment, and also thereafter made a number of transfers of credits from one job to another at the defendant's request; but finally refused to make any further transfers of credits as requested by the defendant. The court commented that the record was such it could not "determine what amount was due respondent [plaintiff] at any time—no basis for any calculation at all," and held (p. 235: "If it be conceded that appellant had the right to direct the application of the moneys paid to respondent to any particular job, certainly, after such application had been rightly made, as directed by appellant, he would have no right or authority to thereafter direct a different application of the same funds." The court, by way of dicta, went on to say that section 1479(1) had no application to the facts for the reason that the defendant was indebted to the plaintiff on but one obligation for lumber and building material of all kinds, sold and delivered to him, and not upon several obligations; that the accounts were kept separate merely for convenience and constituted one debt which the defendant was primarily obligated to pay. *Pacific Acceptance Corp.* v. *Bank of Italy*, 59 Cal.App. 76 [209 P. 1024], cited by the court as authority for the statement that there was one obligation, does not support it. In *Pacific Acceptance Corp.* v. *Bank of Italy*, there was but one

obligation, a promissory note, not a running account. However, the court in *Hammond Lbr. Co.* v. *Henry,* further said that if, in making the various payments, the defendant "had stated to respondent [plaintiff] that the money came from a certain owner of a certain building, or was the money of another person against whom a lien might be filed, then the situation would be entirely different, but no such statements appear in the record." The case has no application here. This is not an action by plaintiff against Scruggs. If it were it would make no difference how plaintiff had applied the payments made by Scruggs, Scruggs would still owe plaintiff whatever balance was unpaid on all jobs. The situation is entirely different in an action on a bond for labor and material furnished for and used in a specific building.

The courts recognize the individuality of each debit or charge item in a running account as separate and distinct obligations. One of the early cases is *Jefferson* v. *Church of St. Matthew,* 41 Minn. 392 [43 N.W. 74], where the court held that where the creditor had received money from the debtor, the payment "[b]eing paid on account generally, it would be legally applied upon the oldest items of account." (See *Standard Oil Co.* v. *Day,*[1] 161 Minn. 281 [201 N.W. 410,

---

[1] In *Standard Oil Co.* v. *Day,* 161 Minn. 281 [201 N.W. 410, 41 A.L.R. 1291], the court said (201 N.W. 412): "The authorities that hold contrary to our view do so upon the theory that such moneys are impressed with an equity in favor of the surety that entitles it to have the money applied in payment of liabilities incurred by the contractor under the contract. If such an equity exists as against a creditor, who has a current account arising out of the contract and also an account incident to some other and prior transaction, that prevents the creditor and his debtor agreeing that moneys which the creditor has received from payments under a particular contract shall be applied upon such prior indebtedness, it would seem that upon the same logic and reason, if this same creditor's claim consisted exclusively of the old account, he could not safely accept such moneys, with knowledge of their source, upon the old account. The money should still be subject to such equity in favor of the surety, and, if the rule is followed to its logical conclusion, the surety in case of loss could recover payment from the general creditor. This leads to an instability in commercial business that does not have our approval. The creditor should not, in the collection of his money, be burdened with the responsibility of having to know the status of his debtor's accounts, nor the status of the obligation of the surety of the debtor. The surety, in modern business, should be, and usually is, quite able to care for itself. It selects those for whom it becomes surety. Most contractors and subcontractors must necessarily use some of their money that they receive in payment of obligations, not incurred in the particular contract from which their money is received. When they receive their money unconditionally it is their own and they may do with it as they please. If a creditor must stop, before he accepts payments from his debtor, and make the impertinent inquiry as to his standing with his surety, the unsatisfactory results are obvious. Such a position not only

411-413, 41 A.L.R. 1291], cited and quoted from with approval in *S. W. Towle Lbr. Co.* v. *Anderson*, 208 Cal. 371, 375 [281 P. 500]; *Duncan* v. *Thomas*, 81 Cal. 56, 58 [22 P. 297]; *Bay Lbr. Co.* v. *Eaton*, 119 Cal.App. 362, 366 [6 P.2d 289]; *Bay Lbr. Co.* v. *Pickering*, 120 Cal.App. 163, 166 [7 P.2d 371]; *Madera Sugar Pine Co.* v. *Adams*, 68 Cal.App. 111 [228 P. 544]; *Andrew* v. *Bishop*, 132 Me. 447 [172 A. 752, 100 A.L.R. 121]; *Utah State Bldg. Com.* v. *Great American Indem. Co.*, 105 Utah 11 [140 P.2d 763, 767-771]; *F. H. McGraw & Co.* v. *Milcor Steel Co.*, 2 Cir., 149 F.2d 301, 304-307; *Liese* v. *Hentze*, 326 Ill. 633 [158 N.E. 428, 430]; *Trauth* v. *Voss*, 231 Ky. 544 [21 S.W.2d 832]; *Watson* v. *Murphey*, 36 Ariz. 377 [285 P. 1037, 1039]; 20 Cal.Jur. 939, § 23.) In *Madera Sugar Pine Co.* v. *Adams, supra,* 68 Cal.App. 111, the facts were similar to those in the case at bar. The plaintiff entered all charges for materials in a single general account of the contractor, designating therein the particular job for which each item was furnished. Payments made by the contractor were credited to this account generally, without applying the same to any particular job. The action was brought against the owner to foreclose a material lien. The court held that if the plaintiff had produced his book account in court it would have enabled the court to apply the payments in accordance with the provisions of section 1479 of the Civil Code. In *Bay Lbr. Co.* v. *Eaton, supra,* 119 Cal.App. 362, on similar facts, the court said (p. 366): "At the time of receiving payments, there being no direction from anyone as to how the payments should be applied, the plaintiff applied the several payments to the accounts which were earliest in maturity, in strict accordance with the provisions of section 1479 of the Civil Code, and

gives undue regard to the surety, but is in utter disregard of the right to make private contracts and the obligation thereof. Suppose his tailor is delivering a suit of clothes which he has made for the subcontractor, and the latter tenders payment in funds which the tailor knows came from the work covered by a surety bond, must the tailor refuse it, or take it clothed with an equity that, perchance, later permits the surety to take it away from him? A surety is not entitled to such judicial mercies. The tailor has business perils of his own. The business of sureties is inherently one of constant peril, and their imperative watchfulness for their general protection makes it less burdensome for them to guard against the emergency here under consideration, and our view tends more to the stability of ordinary business. We think our previous holdings on this subject are sound, and that we have adopted the better rule. We hold that such funds are not under such circumstances impressed with an equity in favor of the surety. In the consideration of this matter we have considered the original contractor in the same situation as his surety for the purpose of this case."

strictly in accordance with the opinion of this court in the case of *Madera Sugar Pine Co.* v. *Adams,* 68 Cal.App. 111 [228 P. 544]. There is nothing in the case of *Hammond Lbr. Co.* v. *Fanta,* 179 Cal. 652 [178 P. 503], which conflicts with the holding of this court in the Madera Sugar Pine case. The case of *Hammond Lbr. Co.* v. *Fanta, supra,* shows distinctly that the owner of the premises indicated to the lumber company by the assignments of payments specified in the contract that the moneys should be applied upon the payments mentioned in the assignment, and that the lumber company had full knowledge thereof, and as cited in the case of *Hammond Lbr. Co.* v. *Henry,* 87 Cal.App. 231 [261 P. 1027], the appellants might have given notice to the plaintiff or taken proceedings such as to convey notice to the plaintiff as to the application of the funds. But as no direction was given to the contractor, and no knowledge conveyed to the plaintiff concerning the payments, the section of the Civil Code which we have cited is controlling. The fact that the plaintiff knew that there were different sources from which the contractor Eaton might receive money is not equivalent to notice or knowledge that the contractor had received any particular payment from any particular source.''

Plaintiff kept a general ledger sheet on which it entered the date, invoice number, and the dollar amount of every order placed by Scruggs. The dollar amount was shown as a charge. As such, every debit or charge represented a single obligation running from Scruggs to plaintiff. Within a few days after the delivery of materials, for both the Colfax school job and others, plaintiff would send to Scruggs an invoice entitled ''This Is Your Invoice,'' describing the materials that had been delivered, as reflected on the delivery receipt of the five-part multicopy forms. At the bottom of every invoice there was a notice of terms of sale: ''Invoiced account due on presentation. Cash discount of _____ will apply on this invoice if paid by the 10th of the month following date of delivery. Due net thereafter. Interest at 8% per annum charged on accounts 30 days overdue.'' Every invoiced account matured on the date of presentation of the invoice. Interest began to run 30 days after maturity. Accordingly, the interest accrued on every invoiced account differed in amount from that of the others. Thus every order placed by Scruggs was a distinct charge or obligation. The materials delivered by plaintiff for other jobs prior to the time it began to furnish materials for the Colfax job

created obligations that were earlier in date of maturity than the invoice accounts for the Colfax job.

Defendants claim Baskin gave Scruggs $9,548.65 and that from this sum Scruggs paid plaintiff in full on the Colfax school account. Plaintiff, in reply, contends that it did not know the source of the funds received by it from Scruggs except the payment received January 22, 1951, for $1,500, and that Scruggs did not designate the application of the payments included in the $9,548.65 except that of January 22d. It further contends that under section 1479 of the Civil Code it had the right to apply the moneys to the extinction of any obligation then due. The court ruled that the payments should have been applied in discharge of the Colfax school account.

The check by which Scruggs made the payment of July 31st, for $2,280.13, was marked "April Statement" and the one of August 17th, for $2,000, was earmarked "On Account May." The August 31st payment was not designated for application to any particular account. All three of these payments were made prior to the first payment by Baskin to Scruggs, September 9th, and, therefore, could not have had their source in payments from Baskin to Scruggs.

On September 15th, six days after Scruggs received $3,000 from Baskin, he (Scruggs) gave plaintiff a check for $2,690.75, marked "On A/C." Plaintiff applied this payment to obligations that had arisen prior to June 28th. The court applied it to the Colfax school account. In so doing, it disregarded the application made by plaintiff, and it ignored the injunction contained in section 1479 (3) of the Civil Code which requires the court to apply the payment to the obligations earliest in date of maturity.

On September 29th, Scruggs made another payment to plaintiff in the amount of $3,131.52 although he did not receive his second payment from Baskin until October 10th. It was impossible for more than $309.25 of this September 29th payment to have had as its source money paid by Baskin to Scruggs ($3,000 — $2,690.75 = $309.25), yet the court applied the entire sum of $3,131.52 to the Colfax school account. As of September 29th, the value of the materials delivered by plaintiff to Scruggs for the Colfax school job was $4,314.20. By applying the September 15th and September 29th payments, totaling $5,822.27, to the Colfax school account, the court: (a) credited to that obligation $2,822.27 more than Scruggs had on September 29th received from Baskin; (b) credited to

the Colfax school account $1,508.07 more than Scruggs owed on that job; (c) disregarded the application made by plaintiff-creditor of the payments; and (d) ignored the requirement of section 1479 of the Civil Code as to application of these payments to older obligations.

▉ The record shows a payment of $2,000 from Baskin to Scruggs on October 10th, but no further payment from Scruggs to plaintiff until November 14th. In view of the remoteness of these transactions, it cannot be said that the Baskin to Scruggs payment was the source of the Scruggs to plaintiff payment. The mere showing of payment is not sufficient evedince for a conclusion that one is traceable to the other.

On November 9th, Baskin gave Scruggs a check for $3,048.65. On November 14th, five days later, Scruggs paid plaintiff $2,428.78. As of November 14th, Scruggs owed plaintiff on the Colfax job, without the crediting of any payments, $6,857.98. The payments of September 15th, $2,690.75, September 29th, $3,131.52, and November 14th, $2,428.78, totaled $8,251.05. The court credited the Scruggs' Colfax school obligation with this $8,251.05, which was $1,393.07 more than Scruggs then owed on that account.

If any part of the payment of September 29th could be applied to the Colfax job, the most that could be credited to that job is the total of the following: September 15th, $2,-690.75, September 29th, $309.25, and November 14th, $2,428.78. These three payments total $5,428.78. This is $1,429.20 less than the accrued amount of the Colfax school account as of November 14th, and it is $2,707.93 less than plaintiff's total claim after crediting the earmarked payment from Baskin to Scruggs and plaintiff of January 22, 1951.

As of December 29, 1950, plaintiff established a separate ledger sheet for the Colfax school job. On and after December 29th, Scruggs made purchases amounting to $1,768.86. An earmarked payment from Baskin to Scruggs and plaintiff was made in January, 1951, for $1,500. Under the theory adopted by the court, the largest amount of payments prior to December 29, 1950, that could be applied to the Colfax school obligation would be $5,428.78, which would leave as of December 29, 1950, a balance owing of $2,563.90 ($7,992.68 — $5,428.78 = $2,563.90). When this is added to the $1,768.86 incurred on and after December 29th, and the $1,500 is deducted, a figure of $2,832.76 is found to be the balance.

In the absence of anything appearing as to the source of the fund from which a subcontractor makes a payment to a materialman, to whom he is indebted on account of several obligations, without any direction as to application, the payment may be applied by the materialman to any obligation. (*S. W. Towle Lbr. Co.* v. *Anderson,* 208 Cal. 371, 375 [281 P. 500]; *Bay Lbr. Co.* v. *Pickering,* 120 Cal.App. 163, 166 [7 P.2d 371]; *Bay Lbr. Co.* v. *Eaton,* 119 Cal.App. 362, 366 [6 P.2d 289].) ██ Where there is a running account, the creditor may apply a payment to any item. ██ General credits on open accounts stand as payments on the oldest items of such accounts unless some other application be clearly indicated. (*Electrical Supply Co.* v. *Eugene Freeman, Inc.,* 178 La. 741 [152 So. 510, 512]; *Titus* v. *Electric Supply Co.,* 172 Okla. 408 [45 P.2d 515, 517]; 70 C.J.S. 265, § 59.) ██ The burden of proving a particular application of a payment by either the debtor or creditor is on the party claiming that such application was made. (*Madera Sugar Pine Co.* v. *Adams,* 68 Cal.App. 111, 115 [228 P. 544]; 20 Cal.Jur. 944, § 26.) ██ The burden was on plaintiff to prove he applied the payments to obligations other than the one in suit. ██ Plaintiff introduced in evidence the general ledger sheet, a summary statement, and the ledger recap. The summary statement broke the running account down by jobs and showed the purchases made each month. The exhibits revealed the application of the payments, and the general ledger sheets also showed the running balance. Plaintiff sufficiently proved the application of the payments to other obligations. (*Madera Sugar Pine Co.* v. *Adams,* 68 Cal.App. 111, 115 [228 P. 544]; *Bay Lbr. Co.* v. *Eaton,* 119 Cal.App. 362, 366 [6 P.2d 289].) But even if the court could have properly found that neither Scruggs nor plaintiff designated the application of the payments, or that plaintiff had not made the application within a reasonable time after performance, the court was required by section 1479 (3) of the Civil Code to apply the payments to the obligations earliest in date of maturity,—that is, the charges that had arisen prior to June 28th on other jobs and which were due and owing at the time of performance. ██ The general rule is that in the case of a running account, where there are various items of debt on one side and various items of credit on the other occurring at different times, and no special application of payments has been made by either the debtor or the creditor, the court will apply the payments in

discharge of the items of debit antecedently due in the order of time in which they stand in the account. Each item of payment is applied in extinguishment of the earliest items of debt until the payment is exhausted. (70 C.J.S. 276, § 72, b. See cases cited.) ▮▮▮ Defendants, as principal and surety on the labor and material bond, being the parties secondarily liable for the materials furnished by plaintiff and used in the Colfax school job, ''cannot control the application of a payment by either the debtor or creditor, and where neither party applies the payment to a specific debt the court is not required to apply it so as to exonerate such third persons''; but rather the court is required to apply it according to the formula prescribed by law. (*Bank of America* v. *Kelsey,* 6 Cal.App.2d 346, 352 [44 P.2d 617].)

The cases of *Johnston* v. *Groom,* 99 Cal.App. 462 [278 P. 935], and *Hart, Schaffner & Marx* v. *Vaughn,* 17 Cal.App.2d 516 [62 P.2d 377], are cited by defendants to support the proposition that plaintiff credited all the payments on the open account and that in breaking down the account according to jobs and applying the money to the oldest obligations, it in effect changed the application of the payments. In both of these cases the opinions clearly indicate that the debtor specifically designated the application of the payments to certain jobs and indebtednesses. Where the creditor has received money under those conditions, the application cannot be changed so as to injuriously affect the rights of third parties. In the present case, Scruggs did not designate the application of the payments to specific jobs. Plaintiff credited the payments to the running account. General credits on open accounts stand as payments on the oldest items of such accounts. When plaintiff broke down the general ledger sheets according to jobs, it merely posted the payments to the obligations earliest in date of maturity.

▮▮▮ Sections 7108 and 7120 of the Business and Professions Code are not applicable to the issues. Defendants claim that those sections create the presumption that Scruggs gave plaintiff the money he received from Baskin. Sections 7108 and 7120 state the grounds for disciplinary action against a contractor or subcontractor who diverts funds or property received for the prosecution or completion of a specific construction project or operation for any other construction project or operation, obligation or purpose, and against a contractor who wilfully or deliberately fails to pay any moneys when due for materials or services rendered in con-

nection with his operations as a contractor. The present suit is not an action by the registrar of contractors against Scruggs. Under the terms of his contract, Scruggs was to receive $14,850 for the furnishing and installation of electrical materials. The cost of labor was included. However, defendants argue that under the so-called presumption the entire sum of $9,548.65 which Baskin paid to Scruggs was given to plaintiff for the electrical materials furnished for the Colfax job. In addition to this $9,548.65, they say, in effect, that Scruggs paid plaintiff $2,795.64, or a total of $12,354.29. This leaves only the small balance of $2,505.71 of the contract price to be used for labor. It is common knowledge that wages constitute a considerable portion of the costs of installation. There is no evidence from which it may be inferred that Scruggs diverted any funds. For aught that appears, he may have devoted all of the funds he received from Baskin to the payment of labor and other materials in the performance of his contract with Baskin.

We conclude that the finding that plaintiff had been paid in full is not supported by the evidence.

Reversed.

Shinn, P. J., concurred.

Wood (Parker), J., did not participate.

Respondents' petition for a hearing by the Supreme Court was denied January 20, 1954.