NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., a corporation, Appellant (Defendant and third party plaintiff below),

v.

STUDER TRACTOR AND EQUIPMENT CO., a corporation, Appellee (Plaintiff below),

and

Gordon P. STUDER, Appellee (Third party defendant below).

No. 4250.

Supreme Court of Wyoming.

Oct. 31, 1974.

John R. Hickisch, of Weller, Friedrich, Hickisch & Hazlitt, Denver, Colo., William S. Bon, Casper, for appellant.

B. J. Baker, of Brown, Drew, Apostolos, Barton & Massey, Casper, for appellees.

Before PARKER, C. J., and McEWAN, GUTHRIE, McINTYRE, and McCLINTOCK, JJ.

McCLINTOCK, Justice.

National Union Fire Insurance Company of Pittsburgh, Pa.[1] appeals the decision of the district court of Natrona County, Wyoming granting separate summary judgments against it.

The proceedings in this matter have been protracted. By complaint filed September 21, 1965 Studer Tractor sought judgment against Donald J. Kelley, dba Kelley Construction Co.[2] and against its surety, National Union, upon four counts, including two for rentals claimed to be due from Kelley for equipment furnished to Kelley and used by him in the execution of highway projects bonded by National Union. National Union, in addition to denying the allegations of the complaint, asserted a counterclaim against Studer Tractor based upon a general indemnity agreement claimed to have been executed by that company on July 16, 1962 and still to be effective in the months of December, 1963 through June, 1964 when some five highway bonds totaling in excess of $1,000,000 were executed by National Union for Kelley. Studer Tractor denied that it was an indemnitor of Kelley with respect to these bonds and further asserted that Studer had

1. Hereinafter referred to as National Union. Appellee Studer Tractor and Equipment Co., plaintiff below, will be referred to as Studer Tractor. Appellee Gordon P. Studer, brought into the action by National Union in a third party complaint, will be referred to as Studer.

2. Hereinafter referred to as Kelley. His whereabouts at the time of filing the action were apparently unknown, and while he was originally designated as a defendant in the action, no service was had upon him and he was not designated as a cross-defendant in National Union's pleadings.

no authority to enter into an indemnity agreement on its behalf.

The parties then took depositions of certain witnesses and a pretrial conference was held August 15, 1969 following which a new Answer, Counterclaim, and Third Party Complaint was filed by National Union, bringing in Studer as a third party defendant. On June 19, 1970 a motion for summary judgment was filed seeking dismissal of the counterclaim and third party complaint. After briefs and argument, summary judgment containing findings and granting the motion, but delaying its finality until the adjudication of other issues under the complaint, was entered on June 29, 1971, dismissing the counterclaim and third party complaint.

After this pretrial summary judgment had been granted disposing of the counterclaim and third party complaint, Studer Tractor elected to proceed against National Union on its bond only with respect to the two counts of its complaint which related to the amounts due to Studer Tractor from Kelley for rental of equipment, and in November, 1971 moved for summary judgment for the amounts due for equipment rental. Affidavits and briefs were filed and National Union again took the deposition of Studer. On April 2, 1973 summary judgment was entered dismissing the counterclaim and third party complaint and in favor of Studer Tractor in the amount of $8,220.40 upon the two remaining counts of the complaint. This appeal then followed.

*The Summary Judgment Dismissing the Counterclaim and Third Party Complaint*

After submission of briefs and argument the district judge on February 23, 1971 issued a written memorandum opinion sustaining the motion for summary judgment but the order was not entered until June 29, during which period a considerable correspondence took place and National Union attempted to have a new hearing upon the motion or alternatively to have the court rule specially on the admissibility of the evidence as considered by the court. The

motion for summary judgment quotes admissions of Olson and Dean A. Stone, as made in the course of deposition of those people, specifying those admissions as the basis of the motion, and by an appendix attached to their brief in the district court appellees listed some 26 paragraphs of "undisputed facts" with noted reference to the affidavit or deposition claimed to sustain the fact. That same statement is incorporated in their brief in this Court. Neither in the district court nor in this Court has National Union at any place denied any specific fact so represented as true nor sought to contradict it with other evidence or testimony. Correspondence between counsel for National Union and the trial judge indicates that the former has admitted that the parol evidence of the two principal participants was not in dispute and the order itself, drawn by counsel for appellees but showing approval as to form by National Union's counsel, specifically recites that "counsel for the respective parties have agreed and represented to the Court that there is no genuine issue of any material fact, and that the sole issue for determination on said motion is one of law". We have carefully examined the record and believe that the following facts were disclosed by undenied and uncontradicted evidence which would have been competent upon the trial of the case:

In May or June, 1962 Kelley, who had worked for Studer Tractor as a salesman, wished to go into the business of dirt contracting. At this time there were several small Bureau of Reclamation projects in the range of $10,000 to $15,000 each that he wished to bid on. He contacted the Bon Agency of Casper, Wyoming, a local and independent agency in the bond and insurance business, one of whose principals was National Union. Lee F. Olson, its Wyoming state agent, was brought into the negotiations at an early date, and as a result of negotiations between Kelley, a Leon England from the Bon Agency, and Olson, Studer, then Executive Vice President of Studer Tractor and purporting to act in its behalf, on July 5, 1962 as such executive

vice president signed an instrument entitled "Indemnity Agreement to Cover Specific Contract".

Later in the same month Kelley wished to bid on four other Reclamation jobs, all in the range of $10,000 to $15,000 each, and Studer was asked by Mr. Olson and by either Des Bennion or Leon C. England of the Bon Agency to sign an instrument entitled "General Indemnity Agreement Covers All Bonds For Principal". Studer's uncontradicted testimony is that he was told by these people that this was to facilitate Kelley's bidding on the four specifically contemplated jobs and to save the trouble of executing a specific indemnity agreement for each job. At the time this instrument was signed by Studer and these representatives, they discussed only the four small Reclamation earth contracting jobs, and there was no discussion or negotiation concerning any other possible jobs. This instrument likewise bears Studer's signature as executive vice president. The agreement contains nothing as to the jobs that Kelley will or has bid on. There is no provision limiting the amount of the indemnity, nor is there anything in the agreement as to the time during which the indemnity shall be effective.

Kelley obtained none of these jobs and no performance or payment bonds relating thereto were issued by National Union. Studer stated in an affidavit that after he learned that Kelley had been unsuccessful in obtaining any of the jobs, he called the Bon Agency and talked with Mr. Bennion who told him that Kelley had ceased to do business with them, had cancelled any insurance policies taken out through the Bon Agency, and that the file relating to Kelley had been closed.[3] Mr. Bennion did not tell Studer that the general indemnity agreement had been delivered to National Union. The instrument of July 16, 1962 had

been delivered by him either to England or Bennion and he was not told by anyone that they had delivered it to Olson; he did not learn of this fact until October, 1964. A deposition of Olson confirms that the instrument was delivered to him by Mr. England because Kelley was going to bid some more jobs and rather than run out and get a "separate application each time we had Indemnity Agreements, why he could go ahead and bid each job and save time". It was Olson's recollection that four small jobs were involved.[4]

After the rejection of Kelley's reclamation bids Studer did continue to assist him and helped him obtain several small bonds by another bonding company and through another Casper agency, but he specifically refused Kelley's request that he or his company assist Kelley in obtaining a bond for what is described as the Lucerne-Black Mountain project, a much larger and more complicated job than Kelley had then undertaken, and which is the first of the bonds as to which National Union now claims indemnity under the agreement of July 16, 1962. This contract was awarded to Kelley and a bond executed by National Union in December, 1963 under circumstances involving Studer but in an entirely different way than as indemnitor. Having failed to secure bonding through a Casper agency and having been specifically rejected for bonding by Olson, who was still representing National Union as Wyoming state agent, Kelley made a new contact wtih National Union through the Gates-Stone Agency in Denver, Colorado and secured the issuance of a bond in the sum of approximately $245,000. No representative of that agency or of National Union contacted Studer concerning an indemnity agreement but he endorsed Kelley's note at a Casper bank whereby $45,000 was obtained and eventually used by Kelley

3. In a separate affidavit Mr. Bennion confirmed the circumstances under which the general indemnity bond was executed. He stated that he did not have any specific recollection of the conversation concerning the closing of the file but did not deny that it took place.

4. The agency and authority of representatives of Bon Agency and of Olson is not questioned by National Union.

and the bonding company in satisfaction of claims against the job.[5]

In the period of time between December, 1963 and July, 1964 a total of five bonds were issued by National Union through the Gates-Stone Agency, totaling some $1,150,000. At least once after the Lucerne-Black Mountain bond had been issued, Mr. Stone asked Studer if he personally or his company would be willing to indemnify National Union as to bonds it might write for Kelley and he declined to do so. Olson also testified that to his recollection Studer Tractor did not enter into the transaction involving the Lucerne bond, and that when he was contacted through the Arrow Agency of Casper concerning the issuance of new bonds for Kelley he considered the Kelley file closed and declined to issue any bond for him. It was then that Kelley contacted Gates-Stone Agency in Denver, and Olson had no contact with this application.

The district court found that the general indemnity agreement was ambiguous; that the only matter within the contemplation of the parties and their purpose in the execution and delivery of the agreement was with respect to small bonds, in the range of $10,000 to $15,000, that might be required if Kelley should be successful in bidding any of the four small earth-moving jobs then within the contemplation of the parties; that Kelley was not successful and thereupon the purpose of the parties terminated and the general indemnity agreement became inoperative; that bonds totaling in excess of $1,000,000 thereafter issued by National Union were issued without notice to or request of Studer Tractor or Studer and as to the last four of the five bonds issued they had refused the request of Gates-Stone Agency that they indemnify National Union. It was further found that if the agreement was not ambiguous the only reasonable construction thereof in view of the opening paragraph was that

the indemnitor was to be bound to indemnify only upon bonds written upon the request or approval of the indemnitor. The district court then found that the motion for summary judgment should be granted.

National Union argues in this Court, as it did in the district court, that the terms of the indemnity agreement are clear and unambiguous and that the introduction of evidence that it was intended to relate only to four small bonds which were discussed at the time of the agreement (and which bonds were never issued) is an attempt to vary or contradict those plain written terms by parol, in violation of the rule stated in North American Uranium, Inc. v. Johnston (1957), 77 Wyo. 332, 316 P.2d 325. It was there held that a conveyance absolute on its face could not by parol be shown to be only an option. In Soppe v. Breed (Wyo.1973), 504 P.2d 1077, 1078–1079, this rule was confirmed but it was clearly stated that the rule only applied to evidence which "would contradict, vary, or alter the terms of the instrument", and that application of the rule "is dependent in most instances upon factual situations".

While conceding that the agreement is not by its terms limited to one specific bond, the Studers point to two respects in which the agreement is claimed to be ambiguous. The first of these is said to result from the opening recitation in the agreement that "at the request of the undersigned" National Union "has executed or is about to execute * * * a bond or bonds" in behalf of Kelley, necessitating evidence as to surrounding facts to determine what bonds National Union was about to execute at Studer Tractor's request. The second ambiguity is claimed to arise from the fact that the agreement is unlimited as to the time and amount.

National Union would appear to avoid this claim of ambiguity by assertion that the agreement is to apply to any and all

---

5. This arrangement was the subject of the first two counts of the complaint and it is not clear how this money came to be used by Kelley and National Union, but the two counts were dismissed by Studer Tractor.

bonds that it has theretofore or may thereafter issue, in perpetuity except as the agreement should be terminated by written notice, and that it is unlimited as to the number or amount of such bonds. The effect of this would be that National Union could properly issue any and all bonds sought by Kelley in whatever amounts National Union may feel that Studer Tractor is good for, whether or not within the financial and contracting abilities of Kelley and with or without any further request from or knowledge of the Studers.

We confess that this interpretation does not appeal to us. The instrument itself appears immediately to raise a number of questions: What bonds has National Union already executed at the request of Studer Tractor? What bonds is it about to execute at that company's request? What is the amount of bonds already issued or about to be issued? What does the phrase "about to issue" mean? Does that term refer to the near future or to a period some 18 to 24 months in the future? Does it mean at any future time however distant? In what number and in what amounts will bonds be executed for Kelley? Confronted with such questions the logical course appears to be to take evidence as to the "factual situation" of this particular case, just as was done in *North American Uranium* and *Soppe, supra.* Only by such inquiry can we ascertain and give effect to the intention of the parties.

Blyth v. Pinkerton National Detective Agency (1901), 10 Wyo. 135, 67 P. 619 did not expressly consider the question of the effect of the parol evidence rule. However, in that case the specific problem was presented as to what interpretation should be placed on a writing whereby in consideration of services (the nature and extent of which were not mentioned) to be rendered by the detective agency, Blyth and others did "hereby guarantee the payment of said agency's bill for services in the case at the rate of $8.00 per day and the expenses of each operative from the time they leave the office of the agency until their return". It appeared that the agency

had been retained to conduct an investigation in connection with a criminal prosecution. The defendant was convicted, the conviction was set aside, and a new trial was had. The attorney decided that further investigation by the detectives was necessary and on his own responsibility, but with the belief that payment would be guaranteed by Blyth and the other guarantors, ordered additional work. Blyth was not contacted and defended on the basis that his guaranty related to only one transaction. It is noted that the time that the guaranty was to run and the amount of the guaranty were not fixed in the writing. Extensive evidence was taken in the trial court and judgment was entered against the guarantor on the basis that it was a guaranty without limitation. This Court reversed and in the opinion refers to and quotes with apparent acceptance and approval certain rules as stated in a number of decisions bearing upon the construction of guaranty agreements containing no limitation as to time or amount, which quotations we think particularly pertinent to the pending action.

Thus, in Gard v. Stevens, 12 Mich. 292, 296, a guaranty that "If you will let the bearer have what leather he wants and charge the same to himself, I will see that you have your pay in a reasonable time", was limited to a single transaction.

" * * * We must hold this, or that it is unlimited both as to time and amount. Every person is supposed to have some regard to his own interest; and it is not reasonable to presume any man of ordinary prudence would become surety for another without limitation as to time or amount, unless he has done so in express terms, or by clear implication. If the guaranty was limited in express terms, either as to time or amount, but not as to both, it might be said it was the intention of the guarantor to leave it open as to the other, or that a further limitation could not be implied. But where it contains no express limitation as to either, and there is nothing in the instrument itself from which it can be inferred that it

was the intention of the guarantor to leave it open as to both, we think it must be understood as referring to a single transaction."[6]

Our opinion also referred at some length to the decision of Morgan v. Boyer, 39 Ohio St. 324, where the writing indicated that one Bowlus was "buying a few goods in your line, and anything you may be able to sell him will be paid promptly, as agreed on, which I herewith guarantee". The Supreme Court of Ohio discusses various rules pertaining to the construction of guaranty contracts (39 Ohio St. at 326), including the rule that words of guaranty "are to be understood in their plain and ordinary sense, *when read in the light of the surrounding circumstances and of the object intended to be accomplished*". (Emphasis supplied.) Applying the rules stated, and with the aid of the surrounding circumstances and purpose, the court concluded that it would not be justified in treating the above quoted guaranty as a continuing one.

Also cited by appellees and pertinent to our decision is Columbus Sewer Pipe Co. v. Ganser (1885), 58 Mich. 385, 25 N.W. 377 involving a guaranty or indemnity agreement, the condition of which was that Ganser had arranged and was about to purchase sewer pipe on credit from Columbus, and if Ganser should pay for that pipe the bond would be void. It is noted that there was a limitation as to the amount of the indemnity but none as to the time. An offer of proof as to the purpose of the bond and that it was limited to one particular sewer job was rejected by the trial court. The Supreme Court of Michigan reversed, holding that the evidence offered (parol evidence outside the instrument) was competent. It was said in pertinent part (25 N.W. at 379):

"Their intentions are alone to govern when once ascertained, and when there

is difficulty in giving a satisfactory interpretation of the language used it is the duty of the court to allow every circumstance that can be legitimately brought to bear upon the question to be made use of in discovering the real purpose of the parties. The language used in the bond is not entirely free from doubt and uncertainty. * * * And while no general rule can be adopted which will apply to every case, and the construction to be given in each must necessarily depend largely upon varying circumstances, still we think we may safely say that 'such effect must be given to the instrument as will best accord with the intention of the parties as manifested by its terms taken in connection with the subject-matter and the surrounding circumstances.' 2 Pars.Cont. 21, note."

In Merchants' National Bank v. Cole (1910), 83 Ohio St. 50, 93 N.E. 465, wherein the guarantor had guaranteed "the payment of all notes of F. E. and G. H. Cole held by the Merchants' National Bank, also all renewals of the same, or any new loans made to either" the court said (93 N.E. at 466):

"* * * The language used is to be understood in its plain and ordinary sense, as read in the light of the surrounding circumstances, the situation of the parties, and the object of the guaranty, and that construction given which most nearly conforms to the intention of the parties. * * *"

This opinion considers directly the application of the parol evidence rule to the introduction of evidence concerning the surrounding circumstances and purpose and with specific reference thereto says (93 N. E. at 466–467):

"* * * We do not understand that these cases except such instruments from the general rule that parol evidence is

---

**6.** A more recent Michigan case, emphasizing the importance of circumstances prior to and contemporaneous with the making of the agreement, is Seaboard Surety Co. v. Bach-

inger (1945), 313 Mich. 174, 20 N.W.2d 854, 856. See also Thompson v. Murphy (1931), 61 N.Dak. 134, 237 N.W. 653, 654 and cases there cited.

inadmissible to limit or to enlarge the terms of a written instrument, but that they hold that an unlimited guaranty is equivocal or ambiguous in respect to being continuing, in the absence of words that clearly import such an intention.

"In such cases the instrument is to be construed in the light of the surrounding circumstances, but this does not mean, as some cases would seem to indicate, that the written instrument is to be supplanted by a new contract evolved by the court from the parol evidence. Attention should be given to what is meant by surrounding circumstances, and it should be remembered that they may not be used to contradict or vary the terms of the instrument."

The purpose of permitting the evidence of the surrounding circumstances is to enable the court to put itself in the place of the parties, the better to understand the terms of the contract "and to arrive at the intention of the parties".

■ While the trial judge has found that the agreement of July 16, 1962 became inoperative, we think that a better expression, consistent with his findings and the uncontroverted evidence, would be to say that the indemnity agreement never became operative, for the simple reason that payment and performance bonds as requested by Studer Tractor and for which National Union was to be indemnified were never issued. This appears to us to bring the case within the principle recognized by this Court in *North American Uranium, supra,* that parol evidence is admissible to show a condition precedent relating to the taking effect of the instrument, and applied in McClintock v. Ayers (1927), 36 Wyo. 132, 253 P. 658, rehearing denied 36 Wyo. 156, 255 P. 355. Although the matter was remanded for further trial, it was held a provable defense to an action upon a bank director's guaranty that the instrument was delivered by the signatory directors on the condition that the guaranty would not be effective unless the plaintiff should also obtain another signature. As was there said (253 P. at 661):

"* * * The defendants had the right to impose the condition whatever their reasons * * *, and, if it was imposed as a condition precedent, and the plaintiff had notice of it, and the additional signature was not obtained, the writing did not become effective as a contract.

"* * * The so-called parol evidence rule applies to those writings only that have become final and complete. Whenever, therefore, a writing is put forward against a party as his contract, no principle prevents him from showing that the writing never became a completed contract." [7]

We believe that there is no difference between a condition that another signature be obtained and a condition that a bond or bonds be issued as requested by the indemnitor before that indemnity shall be effective. As said in 3 Corbin on Contracts, § 589, pp. 530–532:

"* * * A written document, unconditional on its face and fully executed, can be shown by oral testimony to have been delivered subject to a condition precedent. As long as the condition has not occurred, so they say, no contract has been made. Therefore, oral proof of the conditional delivery is admissible in spite of the face of the document to the contrary."

We do not think that Employers' Liability Assurance Corporation v. Tebbs (U.S. D.C.Wyo.1956), 137 F.Supp. 869, and Employers Mutual Casualty Company v. Piedmont Supply Company (U.S.D.C.M.D.N.C. 1961), 197 F.Supp. 159, 166–167, strongly relied upon by National Union, require a different result. While in the earlier decision it is said that where no time for performance of an agreement is fixed "the law implies that it will be performed within a

---

7. See also Mapes v. Santa Cruz Fruit Packing Corp. (1946), 26 Wash.2d 145, 173 P.2d 182, 186; National Boulevard Bank of Chicago v. Corydon Travel Bureau, Inc. (1968), 95 Ill.App.2d 281, 238 N.E.2d 81, 87.

reasonable time", we also find this significant passage (137 F.Supp. at 871):

"Reading the indemnity bond in its entirety and particularly those words 'and other obligees' and taking into consideration all the evidence, facts and circumstances, * * * I am inclined to believe that it was the intention of the parties at the time the indemnity bond was executed that it was to be considered as a continuing bond for the protection of the plaintiff in any future contract bonds which it might issue on behalf of the defendant Cal M. Tebbs."

Although the later case held that the particular indemnity agreement there involved was a continuing one, it recognized that determination of the issue as to whether the agreement was a continuing indemnity "depends to a large extent upon what the parties actually intended, to be gathered from all of the transactions and attending circumstances", and quoted from Fidelity and Casualty Co. of New York v. Nello L. Teer Company (1959), 250 N.C. 547, 109 S.E.2d 171, 173 to the effect that interpretation of an agreement is a search for the intention of the parties, to ascertain which "'the court looks to the language used, the situation of the parties, and objects to be accomplished'".

Having examined the language used in the instrument, the situation of the parties, the objects to be accomplished, and all of the attending facts and circumstances, as established by the appellees and without refutation or denial by National Union, we are of the opinion that there was no genuine issue of fact upon the issues raised by the counterclaim and third party complaint and that Studer Tractor and Studer were entitled as a matter of law to dismissal thereof.

*The Summary Judgment Permitting Recovery from National Union upon its Bond*

In contrast to its order granting the first motion for summary judgment the district court, in passing on plaintiff's claim for rentals, did not make any findings of fact, finding only that there was no genuine dispute as to any material fact and that the plaintiff was entitled to judgment in the amount of $8,220.40. The record shows that at least three separate highway construction jobs bonded by National Union and referred to as the Moorcroft, Guernsey, and Lucerne jobs were under way during the period from December, 1963 through at least a part of October, 1964, and that during a part of that time Studer Tractor maintained one ledger account for all of Kelley's transactions except equipment which had been bought and paid for by notes and mortgages negotiated to a third party. Charges for parts, rentals, and repairs used on these three jobs and perhaps others not pertinent to the action, were recorded on this one account without designation of the particular job upon which they might be used. By use of symbols Studer Tractor was able to designate the charge as for parts, repairs, or rentals. Payments by Kelley were for the most part credited on this account without designation of any particular job or item of charge, the notable exception being a payment of $7,500 received from Kelley with the specific instructions that it was in full payment of any charges attributable to the Guernsey job.

However, Studer's testimony, taken on adverse party deposition, is quite clear that by oral agreement with Kelley payments on the account except as to the payment on the Guernsey job would not be applied to the rentals on a conveyor and compressor, the first of which was leased by Kelley under lease agreement effective January 2, 1964, and the second of which was under a similar lease effective in March of that year. Why this was done is not clear.

The record also shows a letter dated October 13, 1964 from Studer to Kelley in

which it is said in the opening paragraph: "The below listed rental invoices have been received by you and are unpaid: * * *

"10 months Rental on Kolman Conveyor, including sales tax and insurance charges    $10,280.
"Less amount paid by Munsinger on Guernsey job    −3,000.

Balance    $7,280.
"8 months Rental on Schramm compressor * * * including Sales Tax and Insurance    $1,968.40

"Grand total Owing on Rental Invoices    $9,248.40"

The record shows no response to this letter.

It is determinable from memoranda filed by the trial judge with respect to this motion that he found a total accruing rental in the amounts just stated, but that in addition to the credit of $3,000 he allowed a further credit of $1,028, representing one month's rental, sales tax, and insurance, during which month the conveyor was on the Moorcroft job. During the course of the proceedings this job was shown to have been completed and accepted by the Highway Commission more than a year prior to claim upon the bond so that limitations against assertion of any claim on that bond had run. Full recovery was permitted as to the compressor, competently shown to have been used on the Lucerne job for eight months.

■ National Union attacks this judgment on the basis that a substantial amount of Kelley's indebtedness was either not covered by the bond or under applicable law payments made by Kelley should have been credited to the oldest indebtedness, by reason of which some of the rentals for the conveyor and compressor would have to be considered as paid. But the rule quoted by it from 70 C.J.S. Payment § 72 b, p. 276, as to how payments are to be applied to a running account, is expressly limited to payments where "no special appropriation of payments has been made by either party", and it is further said, "at common law the creditor is not compelled

to exercise his right of application at the time payment is made", *id.* § 66, p. 270, and the debtor "may be estopped to question the application made by the creditor, as where he receives an account or receipt applying payments in a certain way and fails to object", *id.* § 66, p. 271. As pointed out by the trial judge, the letter of October 13 designating the status of the account as to rentals for the conveyor and compressor was at the end of the ledger transactions between the parties and is a clear indication that except for the $3,000 applied to the Guernsey job none of the credit entries had been or would be appropriated to the conveyor or compressor rental balances, and further that this amounted to an appropriation of all credits not previously appropriated by express understanding of the parties.

These statements of the applicable principles are clearly supported by the cited authorities. Thus, in Electrical Supply Co. v. Eugene Freeman, Inc. (1934), 178 La. 741, 152 So. 510, 512, it is said:

"* * * if the debtor do [sic] not impute his payments when made, the creditor may do so, and, if he makes such imputation and informs the debtor thereof by account rendered which the debtor receives without objection, he cannot afterwards question the imputation." [8]

We have not attempted an exhaustive analysis of the authorities because the point seems so elemental but we believe that General Electric Company v. Anchor Casualty Company (1958), 251 Minn. 305, 87 N.W.2d 639 is particularly in point in discussing the rules and their application to a situation much like ours. The action was against the contractor's surety by a company which had furnished materials for a great number of jobs and for some years had kept only one running account upon which were entered charges for materials furnished on all these various jobs as well as credits for payments made on the account, which payments were merely desig-

8. See also Romero & Sons Lumber Company v. Babineaux (La.App.1963), 151 So.2d 714, and Marks v. Deutsch Construction Co., Inc. (La.App.1972), 258 So.2d 676, 678.

nated as to apply on account. After the account had run in this manner for some time the plaintiff sent a letter to the contractor indicating how application of the payments had been made. The balance shown was acknowledged to be correct. It was the intention of this letter to separate bonded jobs from those which were not and the surety claimed that it was error to grant summary judgment, contending that payments upon a running account accepted by the creditor without at that time making specific application thereof could not later be applied to specific charges by action of the creditor. Citing authority, the Supreme Court of Minnesota stated the generally applicable rule to be that (87 N. W.2d at 642):

"* * * a debtor has the right to direct upon which part of an indebtedness any specific payment is to be made. If the creditor accepts payment when the debtor has exercised this right, he is bound to conform to the direction. If the debtor makes no such direction, the creditor may, within a reasonable time, apply it as best suits his interest."

Concerning the surety's argument as to application of payments to the running account, the court said (87 N.W.2d at 643):

"* * * Its position seems to be, although not specifically so expressed, that, since the payments were made and accepted as payments on a running or general account, such entering of the payments as credits on such account was an application of such payments and that plaintiff could not thereafter apply those payments to specific items in the general account."

After quoting from other cases, the court concluded (87 N.W.2d at 643):

"A payment credited on a general or running account certainly cannot be considered an *application* of such payment to any specific item."

The court further points out that this right of application is subject to two important restrictions, namely, that the creditor must send the debtor seasonable notification and the application must be seasonably made or within a reasonable time. In the present case, in addition to the oral testimony concerning agreement as to application, the letter of October 13, 1964 was sent out while the account was still accruing. If not previously made, the application was certainly made on October 13, at a time when there was no controversy or argument between the parties except that Studer Tractor was beginning to be concerned about Kelley's financial condition.

The Minnesota opinion cites Hollywood Wholesale Electric Company v. John Baskin, Inc., 121 Cal.App.2d 415, 263 P.2d 665, and F. H. McGraw & Co. v. Sherman Plastering Co. (D.C.D.Conn.), 60 F.Supp. 504, affirmed, 2 Cir., 149 F.2d 301, in both of which cases payments had been made and credited to a running account, then later applied to a specific charge. In each case the application was held to have been made within a reasonable time and we think that these three cases adequately deny National Union's contention that application of payments cannot be changed to the detriment of a third person. As was further said in *General Electric Company, supra* (87 N.W.2d at 645):

"If the general rule is that the creditor has a reasonable time within which to make his application of payments to specific jobs and that such reasonable time extends at least up to the time controversy on the subject has arisen between the parties, all payments made prior to the application must have been credited to some account, and the only account in sight in that situation is the general running account. It must follow that payments entered in the general running account are available for specific application within a reasonable time in the future."

National Union's contention as made in its reply brief that the letter of October 13, 1964 is not competent evidence, being a mere self-serving letter of the plaintiff, we find to be completely without merit. No contention has been advanced that

the letter was not written by Studer and received by Kelley or that it was not written in the ordinary course of business. It does the very thing which the decisions quoted above hold must be done, that is, bring home to the debtor that an application has been made by the creditor. We believe that it is in the same category as the rendering of an account by a creditor to the debtor and believe that it was completely competent.

Counsel also contend that the lease for the conveyor is clear and explicit and is for a total rental of $3,000 regardless of the time that the conveyor might be in the possession of Kelley. The term of the lease is said to be for "three *or more months* beginning January 2, 1964" and "for said term or any portion thereof, Lessee shall pay to Lessor rentals aggregating $3,000, of which $1,000 is herewith paid in advance and the balance" is payable in two equal monthly payments of $1,000 each. The Studers claim that there is an ambiguity because no one would rent for an indeterminable time a property worth $1,000 a month and that the instrument is subject to the construction that it is a rental on the basis of $1,000 a month. We have doubts as to which construction is correct and therefore must agree that there is an ambiguity.

■ In such instance we think that the doctrine of construction by the parties is of importance. In Holliday v. Templin (1940), 56 Wyo. 94, 103 P.2d 408, 413, it is said that "where the parties to a contract have given a practical construction thereto by their conduct, such construction is entitled to great if not controlling weight." This statement was reiterated in Wyoming Abstract & Title Company v. Wallick (1948), 64 Wyo. 458, 196 P.2d 384, 386, and was accepted as law in this state by the United States Court of Appeals for the Tenth Circuit in Chevron Oil Company v.

Barlow (1969), 406 F.2d 687, 692, where it was said that in construing an ambiguous contract a court "may resort to extrinsic evidence such as the conduct of the parties to ascertain the true meaning of the instrument, and if possible, the interpretation given the instument by the parties".

In addition to the letter of October 13, 1964, the record contains a number of invoices, the first of which is dated December 31, 1963, "To charge Rent for three month period beginning January 2, 1964, on:" one Kolman conveyor at a unit price of $1,000 for a total amount of $3,000, plus sales tax of $80 and insurance of $24 for a total of $3,084. An invoice of April 2, 1964 charges an additional $24 for insurance from that date to July 2, 1964. Invoices on each month for April through October charge $1,000, plus $20 in sales tax, for rent for the succeeding month. Both the original invoice and the one in April also bear the notation, "TERMS: $1,000 per Month beginning 1–2–64 per Lease Contract". These invoices, apparently accepted by Kelley with objection, together with the running account showing charges in each month, plus the letter, certainly indicate the practical construction of the lease contract by the parties themselves.

We are therefore of the opinion that the summary judgment on the complaint was correct except in one small detail: that while the district court made proper deduction of insurance and sales tax for the month that the conveyor was used in Moorcroft, it did not make similar allowance for the three months that it was used on the Guernsey job, which account was settled in full. There should therefore be deducted from the judgment as entered the sum of $74. To that extent the judgment will be modified, and as so modified the judgment upon the complaint and dismissing the counterclaim and third party complaint is affirmed.