[Civ. No. 1329. Fifth Dist. July 15, 1971.]

CHARLOTTE W. PIKE, Plaintiff and Respondent, v.
WILLIAM P. TUTTLE, Defendant and Appellant.

748

**COUNSEL**

Dennis L. Woodman for Defendant and Appellant.

Jensen & Pendergrass and J. Wilmar Jensen for Plaintiff and Respondent.

**OPINION**

**GARGANO, J.**—Appellant appeals from a judgment, after court trial, awarding respondent $4,000 on a promissory note, together with accrued interest and attorney's fees. The facts are undisputed.

In 1958 Ray Pike loaned $54,562 to Russell M. Edson and Anna E. Edson for the purchase of a nursing home. The loan was evidenced by a promissory note calling for $250 monthly payments on principal, pay-

able on the tenth day of each month, and monthly interest payments on the unpaid balance at the rate of 8 percent per annum, and was secured by a first deed of trust against the nursing home. The deed of trust, hereafter referred to as the Pike-Edson trust deed, provided for additional loans, and in this respect contained the following provision: ". . . any additional sums and interest thereon which may hereafter be loaned to the Trustor or his successors or assigns by the Beneficiary, and the performance of each agreement herein contained. Additional loans hereafter made and interest thereon shall be secured by this Deed of Trust only if made to the Trustor while he is the owner of record of his present interest in said property, or to his successors or assigns while they are the owners of record thereof, and shall be evidenced by a promissory note reciting that it is secured by this Deed of Trust."

In September 1960 the Edsons sold the nursing home to Dr. William P. Tuttle subject to the Pike-Edson trust deed, and Tuttle assumed the obligation to make the payments. He also gave the Edsons a second trust deed on the nursing home to secure the balance of the unpaid purchase price. Dr. Tuttle made the monthly payments on the Edsons' note as they became due, and by September 12, 1963, had reduced the amount of unpaid principal on that note to $23,750; these payments were recorded by Pike in a payment book and a portion of a page of that book is reproduced in the margin for illustrative purposes.[1]

In September 1963 Pike loaned Tuttle $4,000, and the latter signed a promissory note for that amount. This note, like Edsons' note, called for $250 monthly payments on principal, payable on the tenth day of each month, monthly interest payments on the unpaid balance at the rate of 8 percent per annum and stated that it was secured by the Pike-Edson trust deed; in his payment book Pike designated the loan as a "new added loan" and added the $4,000 to the $23,750 balance which was then

| Jan 10 '63 | Jan 10 | 423 33 | 173 33 | 250 00 | 25 750 00 | RHP |
| Feb 13 | Feb 10 | 421 67 | 171 67 | 250 00 | 25 500 00 | RHP |
| Mar 10 | Mar 10 | 420 00 | 170 00 | 250 00 | 25,250 00 | RHP |
| Apr 12 | Apr 10 | 418 33 | 168 33 | 250 00 | 25 000 00 | RHP |
| May 10 | May 10 | 416 67 | 166 67 | 250 00 | 24 750 00 | RHP |
| June 12 | June 10 | 413 00 | 165 00 | 250 00 | 24 500 00 | RHP |
| July 12 | July 10 | 413 33 | 163 33 | 250 00 | 24 250 00 | RHP |
| Aug 12 | Aug 10 | 411 67 | 161 67 | 250 00 | 24 000 00 | RHP |
| Sept 12 | Sept 10 | 410 00 | 160 00 | 250 00 | 23 750 00 | RHP |

owing on the note signed by the Edsons;[2] also the words "added loan" were written across the face of the second note. Thereafter Dr. Tuttle made a single payment of $250 per month toward principal plus monthly interest payments of 8 percent per annum on the combined balance; the monthly payments continued until July 9, 1965.

In January 1965 Ray Pike died, and his widow was appointed executrix of his estate. In August Tuttle defaulted on all his obligations, and the Edsons foreclosed on their second deed of trust and took possession of

---

[2]The following is an excerpt from Pike's payment book which illustrates the manner in which he treated the new loan and all payments made thereafter:

| DATE OF PAYMENT | DATE DUE | AMOUNT PAID | CREDITED ON INT. | CREDITED ON PRIN. | BAL. OF PRIN. UNPAID | TO WHOM PAID |
|---|---|---|---|---|---|---|
| Sept. 12 | Sept 10 | 410 00 | 160 00 | 250 00 | 23750 00 | RAP. |
| New added loan Sept. 10 '63 = | | | | | 4000 00 | RAP |
| New balance Sept. 10 '63 = | | | | | 27750 00 | RAP. |
| Oct. 10 | Oct. 10 | 435 00 | 185 00 | 250 00 | 27500 00 | RAP. |
| Nov. 12 | Nov. 10 | 433 34 | 183 34 | 250 00 | 27250 00 | RAP. |
| Dec. 10 | Dec. 10 | 431 67 | 181 67 | 250 00 | 27000 00 | RAP. |
| Jan. 10 '64 | Jan. 10 | 430 00 | 180 00 | 250 00 | 26750 00 | RAP. |
| Feb. 11 | Feb. 10 | 428 34 | 178 34 | 250 00 | 26500 00 | RAP. |
| Mar. 10 | Mar. 10 | 426 67 | 176 67 | 250 00 | 26250 00 | RAP. |
| Apr. 12 | Apr. 10 | 425 00 | 175 00 | 250 00 | 26000 00 | RAP. |
| May 9 | May 10 | 423 33 | 173 33 | 250 00 | 25750 00 | RAP. |
| June 10 | June 10 | 421 66 | 171 66 | 250 00 | 25500 00 | RAP. |
| July 11 | July 10 | 420 00 | 170 00 | 250 00 | 25250 00 | RAP. |
| Aug. 10 | Aug. 10 | 418 50 | 168 50 | 250 00 | 25000 00 | RAP. |
| Sept. 10 | Sept. 10 | 416 67 | 166 67 | 250 00 | 24750 00 | RAP. |
| Oct. 10 | Oct. 10 | 415 00 | 165 00 | 250 00 | 24500 00 | RAP. |
| Nov. 10 | Nov. 10 | 413 34 | 163 34 | 250 00 | 24250 00 | RAP. |
| Dec. 10 | Dec. 10 | 411 67 | 161 67 | 250 00 | 24000 00 | RAP. |
| Jan. 10 '65 | Jan. 10 | 410 00 | 160 00 | 250 00 | 23750 00 | RAP. |
| Feb. 10 | Feb. 10 | 408 33 | 158 34 | 250 00 | 23500 00 | C.W. |
| March 10 | Mar. 10 | 406 67 | 156 67 | 250 00 | 23250 00 | C.W. |
| April 10 | April 9 | 405 00 | 155 00 | 250 00 | 23000 00 | C.W. |
| May 10 | May 10 | 403 33 | 153 33 | 250 00 | 22750 00 | C.W. |
| June 10 | June 10 | 401 67 | 151 67 | 250 00 | 22500 00 | C.W. |
| July 9 | July 10 | 400 00 | 150 00 | 250 00 | 22250 00 | C.W. |

the property. They then paid off the first loan and received a reconveyance from Pike's executrix, after taking the position that all payments made by Tuttle for the period from October 1963 to July 1965 inured to the benefit of the first loan only. When Tuttle also refused to pay the $4,000 loan, contending that the loan was discharged by the first sixteen $250 payments he made to Pike, the widow instituted this action in the court below, and the cause proceeded to trial before the judge sitting without a jury.

The court inter alia found that the Pike-Edson trust deed was a purchase money deed of trust as to the Edson loan but not as to the $4,000 loan Pike made to Tuttle; that the $4,000 loan was authorized by the Pike-Edson deed of trust but because Pike knew that Tuttle had given the Edsons a second deed of trust, the resulting lien was a third lien against the nursing home; that the principal payments on the $4,000 note were exactly the same and were due on the same date as the principal payments on the Edson note; that during the period from October 1963 to July 1965 Tuttle made a single monthly principal payment of $250 per month and that neither he nor Pike informed the other as to the manner the payment was to be applied; that no payments were made by Tuttle on the $4,000 note and that after the Edsons foreclosed they paid off the first deed of trust without reference to the second loan. The court concluded that the $250 per month payments made by Tuttle to Pike during the period in question were applied to reduce the balance on the Edson note, that because the second loan was not secured by a purchase money mortgage, section 580b of the Code of Civil Procedure was inapplicable and that Pike's executrix was entitled to recover the amount of the loan from Tuttle, together with accrued interest at the rate of 8 percent, and reasonable attorney's fees in the amount of $390. This appeal followed.

The court properly found that although the $4,000 loan was authorized by the Pike-Edson deed of trust, the resulting lien was a third lien and subordinate to the trust deed Tuttle gave the Edsons on the nursing home; Pike knew that Tuttle had given the Edsons a second trust deed, and it is the rule that if the mortgagee is not bound to make advances, as was true in this case, priority is determined by the circumstances existing at the time the advance is made, and if at that time the mortgagee has actual notice of other liens, the other liens have priority. (*Imhoff* v. *Title Ins. & Trust Co.*, 113 Cal.App.2d 139 [247 P.2d 851].) The court also correctly found that the Edsons' foreclosure of their second trust deed eliminated Pike's security on the $4,000 loan, and that because the loan was not made in connection with the purchase of the nursing home, Tuttle was personally liable for the debt unless it had been extinguished.

■    The crucial question is this: Does Civil Code section 1479 compel the presumption, as appellant contends, that the monthly payments Tuttle made to Pike during the period from October 10, 1963, to July 9, 1965, were applied toward the extinction of the $4,000 loan, since that obligation was earliest in date of maturity and was secured by the more precarious lien?[3]

Contrary to the implications which necessarily follow from the trial court's finding that neither Pike nor Tuttle indicated to the other the manner in which the $250 payments were to be applied, the evidence leads to the inescapable conclusion that the men treated the two loans as one debt and intended to discharge the combined obligation over the same period of time through the payment of a single monthly installment of $250 each month. Both notes were purportedly secured by the same trust deed, and neither contained a precise maturity date; each was dischargeable through the payment of monthly installments and, significantly, these installments, as well as the interest rate and date of payment were exactly the same. The words "additional loan" were written across the face of the Pike-Tuttle note, and Pike designated that loan as a "new added loan" in his payment book; he also added the amount of the loan to the Pike-Edson note balance, raising that balance to $27,750. Tuttle not only testified that a single monthly payment of $250 on both notes was contemplated, but he made one such monthly payment without variation or interruption for a period of 22 months; yet he also made a monthly interest payment on the combined reduced balance of both notes.

Nevertheless, the trial judge correctly concluded that Civil Code section 1479 was inapplicable, and we affirm the judgment. This is not a situation where both the debtor and creditor failed to direct the application of a payment as contemplated by section 1479, so as to bring into play the presumptions articulated there. It is a case where the parties unequivocally indicated their intentions but were thwarted in the realization of those intentions because of the intervening rights of a third party. What the debtor and creditor intended to accomplish is undeniable, but they failed to exercise properly their power of application. As we have demonstrated, Ray Pike and Dr. Tuttle undoubtedly believed that the two loans were

---

[3]Under Civil Code section 1479, if a debtor who owes two or more obligations to the same creditor and makes payment on one obligation without specifying the manner in which payment is to be applied, the election may be made by the creditor. But if neither party makes such application, the performance must be applied to the extinction of the obligations in the following order:

"1. Of interest due at the time of performance.

2. Of principal due at that time.

3. Of the obligation earliest in date of maturity.

4. Of an obligation not secured by a lien or collateral undertaking.

5. Of an obligation secured by a lien or collateral undertaking."

in effect one obligation secured by the same security and that the combined obligation could be discharged through a single monthly payment. But Tuttle had given the Edsons a second trust deed and had assumed their obligation to make the payments on the Pike-Edson loan. Therefore, despite the intention of the parties, the loans remained different in nature and in legal effect were secured by entirely different liens and could not be discharged as a single obligation in the manner attempted.

Under these circumstances, we must resort to the common law to resolve the dilemma. It is settled that where none of the rules prescribed by the statute cover or apply to the particular situation, application of a payment will be made on common law principles. (*Bank of America* v. *Kelsey,* 6 Cal.App.2d 346 [44 P.2d 617]; *Murdock* v. *Clarke,* 88 Cal. 384 [26 P. 601].) Payment will be applied in the manner most consonent with justice and equity; therefore, under the prevailing rule where neither the creditor nor the debtor has made application of a payment, the court will apply it to a debt existing at the time of payment and to the relief of one secondarily liable thereon rather than apply it on a *"subsequently incurred debt."* [Italics added.] (70 C.J.S., § 76, p. 281.)

Because Dr. Tuttle failed to exercise properly his power of application, and because he gave no other directions as to the manner in which he wanted the payments applied, Pike could not have applied the payments to the extinction of the $4,000 loan even if he had wanted to; under the common law rule, he would have been required to apply the payments to the Pike-Edson note Tuttle had assumed. ▪ As the Restatement of Contracts, section 389, states: "When a debtor having power to direct the application of a payment fails *properly* to exercise the power, the creditor *cannot* apply the payment . . . (e) to the exclusion of a claim, failure to discharge which, with the money then paid, will, as the creditor knows or has reason to know, violate a duty owed by the debtor to a third person, whether that duty arises from a fiduciary relation or from a contract." [Italics added.]

To relieve Tuttle of the burden of payment of a just debt by presuming that as to him the payments were applied to discharge that debt, when he gave Pike no such direction and when it would have been impossible for Pike himself to do so, would be patently inconsistent and would lend our approval to the perpetration of an injustice.

The judgment is affirmed.

Stone, P. J., and Brown (G.A.), J., concurred.