[L.A. No. 31478. Mar. 28, 1983.]

JESSUP FARMS et al., Plaintiffs, Cross-defendants and Respondents, v. EILEEN BALDWIN, Defendant, Cross-complainant and Appellant.

COUNSEL

Milo V. Olson for Defendant, Cross-complainant and Appellant.

Hill, Wynne, Troop & Meisinger, Louis M. Meisinger and C. Dennis Loomis for Plaintiffs, Cross-defendants and Respondents.

OPINION

**REYNOSO, J.**—Eileen Baldwin appeals from a judgment awarding respondents—Jessup Farms, a general partnership, and its partners, individual

members of the Jessup family—contribution for payments made on an obligation for which appellant was a co-obligor; ordering specific performance in favor of respondents of a contract for the purchase of securities in Holstein Heifer Ranch, Inc. (HHR); and denying appellant's cross-complaint for an equitable lien on stock transferred to respondents.

The primary issue we consider is whether payments made by HHR, in which appellant and respondents owned stock, were properly apportioned by the trial court among four outstanding obligations. We examine Civil Code section 1479, subdivision Three, which provides in pertinent part that unspecified payments be first applied to the obligation with the earliest maturity date. Particularly, we inquire whether a subsequent instrument can renew the maturity date of an earlier note so that both obligations can be said to mature simultaneously. This case thus presents a narrow question of statutory construction. A subsidiary issue involving respondents' purchase of stock from appellant's husband requires us to examine the record to determine if substantial evidence supports the trial court judgment that respondents were bona fide purchasers without notice of an alleged unperfected security interest in favor of appellant.

In 1972 HHR had executed a promissory note for which it was principal obligor. Appellant and respondents signed the note as co-obligors. Three subsequent notes executed by HHR were signed by respondents but not appellant. Prior to 1975, HHR made payments in excess of the amount due on the 1972 note but did not specify to which of the outstanding obligations the payments should be applied. After 1975 respondents made additional payments for which they sought contribution from appellant. Further, in 1973 appellant had executed a property settlement agreement which assigned to her husband her interest in HHR stock subject to a purported lien in her favor. Later, in 1974, respondents acquired this stock from appellant's husband pursuant to an option contract.

Appellant makes two contentions on appeal: (1) HHR's payments should have been first applied to the 1972 note thereby extinguishing that obligation prior to the time respondents made the payments for which the trial court awarded contribution, and (2) she has an equitable lien on the HHR stock transferred by her husband to respondents.

For the reasons discussed below, we conclude that the 1972 note had the earliest maturity date irrespective of subsequent renewal instruments and that, therefore, HHR's unspecified payments should have been first applied to extinguish this obligation. Accordingly, we reverse that part of the trial court judgment ordering appellant to make contribution to respondents. With respect to appellant's second contention, we conclude that substantial evidence supports the trial court's ruling that respondents were bona fide purchasers of the

Baldwin stock; we therefore affirm that part of the judgment ordering specific performance of the option contract and dismissing appellant's cross-complaint for an equitable lien.

I

*Summary of Facts*

Appellant's two contentions make necessary a detailed discussion of somewhat complex facts. The principal evidentiary matters relevant to this appeal, however, were substantially undisputed as the parties stipulated to the various transactions by which Jessup Farms obtained ownership of all the stock in HHR and made payments on debts incurred in its operation. We summarize the events and transactions central to this appeal.

In early 1970 appellant and her then husband, codefendant Wayne Baldwin,[1] both residents of Idaho, owned 100 percent of the stock in HHR, an Idaho corporation. On February 16, 1970, Jessup Farms of Glendale, California, purchased 200 shares of HHR stock directly from the corporation. Concurrently with this stock transaction, the parties entered into a separate, written stock purchase agreement whereby the Baldwins agreed to sell and Jessup Farms agreed to buy an additional 150 shares of HHR stock for $105,000.[2] The 350 shares so acquired by Jessup Farms represented 50 percent of the stock of HHR, with the Baldwins then owning the remaining 50 percent as husband and wife.

Since 1969 HHR had been incurring a substantial indebtedness to Fresno-Madera Production Credit Association (PCA), an agricultural lender, in connection with the purchase, care and feeding of HHR livestock. On May 19, 1972, HHR executed in favor of PCA a promissory note in the amount of $5,135,571. This note (entitled "Renewal Promissory Note") constituted a

---

[1] Wayne Baldwin is not a party to this appeal. The trial court entered a default judgment against him. On April 4, 1977, he filed a voluntary petition in bankruptcy in the United States District Court for the Northern District of California.

[2] The document evidencing this latter agreement was lost. The parties therefore executed a new document (entitled "Agreement for Sale and Purchase of Corporate Stock") on August 10, 1971. This document recites that it is identical in form and content to the agreement entered on February 16, 1970, and that the date of the original agreement is to be the effective date of the stock purchase.

Pursuant to the terms of the 1971 stock purchase agreement, the purchase price of $105,000 was payable in 10 annual installments of $10,500 each plus interest at 7 percent per annum on the unpaid principal. To secure the deferred payment of the purchase price, the 150 shares of HHR stock were divided into 10 certificates (each representing 15 shares) which were placed in escrow at the Bank of Idaho in Nampa, Idaho. The terms provided that one certificate would be released by escrow upon the payment of each $10,500 installment. Jessup Farms made installment payments up to December 31, 1973, and 45 shares were released to it from escrow. At the time of trial, there remained in escrow 7 share certificates representing 105 HHR shares, and there remained an unpaid balance in the sum of $63,000, principal, and $25,750, interest, for an aggregate amount of $88,725.

renewal of certain existing indebtedness to PCA plus a commitment by PCA to make additional advances in the sum of $2,485,029.67. The 1972 note was executed by HHR and by appellant and Mr. Baldwin in their individual capacities. PCA also demanded that the Jessups[3] sign the note in light of their status as sole partners of Jessup Farms which, as noted, at the time owned 50 percent of HHR. The partnership itself, however, was not named as a primary obligor on the note. ■ ■ ■ ■ The documents provide and the trial court found[4] that the Baldwins and Jessups were individually liable as co-obligors with HHR on the 1972 note. The documents specifically provide that the note was due on demand or, if no demand was made, on May 6, 1973. There being no demand by PCA, as of the due date on the note a balance of $3,218,804 remained unpaid.

At about this time, appellant and her husband separated and divorce proceedings were initiated. On June 15, 1973, one month after the 1972 note became due, the Baldwins executed a property settlement agreement whereby Mr. Baldwin assigned to appellant his interest in the 1971 stock purchase agreement with Jessup Farms. (See fn. 2, *ante.*) Concomitantly, appellant agreed to convey to her husband her interest in the remaining 50 percent of HHR stock, held by the Baldwins as community property (the Baldwin stock), in exchange for the sum of $267,000 to be paid by Mr. Baldwin over a period of years. It was further agreed that the 350 shares of Baldwin stock transferred to Mr. Baldwin as his separate property were subject to a lien in favor of appellant to secure payment of the $267,000 obligation, and that Mr. Baldwin would place the stock in escrow to secure his performance of the property settlement agreement. This property settlement agreement was incorporated into the final decree of divorce executed in Idaho on March 18, 1974. Appellant stipulated at trial, however, that her ex-husband never performed his obligation to pledge the Baldwin stock and place it in escrow, and that her alleged security interest in the stock was never otherwise perfected pursuant to the method sanctioned by the Idaho Uniform Commercial Code. Instead, a certificate representing the Baldwin stock was executed in blank and left in the possession of appellant's attorney.

On June 22, 1973, one week after execution of the property settlement agreement transferring appellant's interest in the Baldwin stock to her husband, HHR executed in favor of PCA a second renewal promissory note in the amount of

[3]The note was signed by Marquirite Jessup, Roger V. Jessup, Webster M. Jessup, Roger W. Jessup, and Editha J. Reed, all of whom were general partners of Jessup Farms.

[4]Appellant unsuccessfully argued at trial that the 1972 note was executed by HHR; that she signed only as a shareholder; and that, therefore, she was merely a surety, and not a co-obligor, on the note. The trial court properly found that appellant was a principal obligor since the 1972 note expressly states on its face that appellant shall be jointly and severally liable on the debt and nothing in the terms of the note specifies that she executed it in any capacity other than obligor. (See Cal. U. Com. Code, § 3118, subd. (e).)

$6,282,838. This note incorporated the unpaid principal plus interest on the 1972 note ($3,268,753.26) as well as new advances. The 1973 note, in addition to evidencing the obligation created by the new advances, expressly provides that it is given not in satisfaction of, but only for the purpose of renewing the unpaid balance on the 1972 note. This second note, by its terms, matured on May 6, 1974, if no prior demand was made; it also specifically states on its face that the maturity date of the *first* note was May 6, 1973. The 1973 note was thus executed one month and sixteen days after the 1972 note had matured.

The 1973 note was executed by HHR, the Jessups, and Mr. Baldwin. Appellant, however, did not execute the 1973 note in her individual capacity although she did sign it in her capacity as treasurer of HHR. This is consistent with the parties' stipulation at trial that the Jessups and Baldwins had entered into an oral apportionment agreement whereby they agreed that any personal liability arising from the PCA indebtedness would be apportioned in accordance with their respective stock ownership in HHR. Thus, appellant understandably refused to sign the 1973 note as an obligor as she no longer owned stock in HHR (having conveyed her interest in the remaining 50 percent of HHR stock to Mr. Baldwin pursuant to the property settlement agreement). It will be recalled, however, that at the time the 1972 note was executed (by the Jessups and both Baldwins), Jessup Farms owned 50 percent of the HHR stock and the Baldwins owned the remaining 50 percent. The execution of the 1972 note is thus also consistent with the stipulated apportionment agreement.

On January 10, 1974, HHR executed a third note, payable on demand, in favor of PCA in the amount of $42,000. This note was executed by the Jessups, but was not signed by appellant or her ex-husband Wayne Baldwin. The record does not disclose why Mr. Baldwin was not required to sign the third note.

Subsequent to the execution of the 1973 note, and continuing until after execution of the third note, HHR had made numerous payments to PCA. As earlier noted, at the time the 1973 note was executed an unpaid balance of $3,268,753.26 was still due on the 1972 note. As a result of HHR's continuing and substantial payments, HHR was able to pay PCA a sum in excess of the unpaid balance of the 1972 note, the only note signed by appellant as an obligor. PCA, however, applied HHR's payments to the total indebtedness and made no specific allocation to any of the outstanding obligations. PCA kept a running account which showed only the total due, and HHR had not designated in what manner the payments should be applied with respect to the outstanding promissory notes. Despite the large payments by HHR, a substantial amount remained of HHR's total indebtedness to PCA.

Therefore, on March 13, 1974, PCA made written demand on HHR, the Jessups, and the Baldwins for payment on the balance due on the total in-

debtedness. PCA's demand letter made specific suggestions to HHR on how to liquidate its assets in order to pay its indebtedness to PCA. The Baldwins paid nothing in response to the demand letter. Although HHR began an orderly liquidation of its assets, it too was unable to comply with the demand.

Thereafter, Jessup Farms devised a plan to buy out Wayne Baldwin's interest in HHR. Accordingly, on March 19, 1974 (the day following entry of the final decree of divorce), Mr. Baldwin and respondents, each represented by counsel, executed a written agreement granting Baldwin a 60-day option to acquire Jessup Farms' interest in the HHR stock if he paid all of HHR's debts. The March 19 option agreement further provided that Wayne Baldwin's failure to exercise the option would entitled respondents to the Baldwin stock. An escrow account was opened with PCA. Appellant's attorney deposited the certificates representing the Baldwin stock in the PCA escrow to facilitate consummation of the March 19 agreement. Subsequently, Wayne Baldwin failed to exercise the option agreement thereby entitling Jessup Farms to the remaining 50 percent of the HHR stock without having to pay anything for it. Mr. Baldwin, however, refused respondents' request to deliver the stock certificates. At the time of trial the Baldwin stock remained in possession of PCA.

On May 8, 1974, HHR executed a fourth promissory note in favor of PCA for $336,474. This final note was signed by all the partners of Jessup Farms, except Roger Jessup, but neither of the Baldwins signed the note.

On December 30, 1974, PCA wrote a second demand letter demanding payment of the total indebtedness of HHR. The Baldwins again ignored PCA's demand. Respondents, however, decided to protect their interest in HHR and, on January 3, 1975, they made the first of three payments totaling $1.1 million.[5] These payments were apparently motivated by respondents' concern that their personal assets, including their interests in the partnership, would be vulnerable to loss. These latter payments, combined with HHR's earlier payments, were sufficient to extinguish the first two notes. PCA acknowledged at trial that the 1972 and 1973 notes were paid in full, and it affirmatively released and discharged all signatories from further liability.

After making these payments, respondents made written demands on each of the Baldwins for contribution. Respondents purported to seek contribution from appellant only insofar as she had agreed to be bound by the apportionment agreement which, as noted, provided that liability on the notes be apportioned according to the parties' respective ownership interest in HHR stock. Respondents were unable to obtain contribution from either of the Baldwins nor were they able to enforce the March 19 agreement with Mr. Baldwin.

[5]Respondents made three payments as follows: January 3, 1975—$100,000; January 15, 1975—$50,000; August 16, 1976—$950,000.

*Proceedings Below*

On February 4, 1977, respondents filed an amended complaint seeking in three causes of action (1) a declaration that they owed nothing to appellant on the stock purchase agreement of 1971 because that balance was offset by her duty of contribution to respondents for the payments made after January 1975, and that Jessup Farms as full owner of the shares is entitled to possession; (2) a money judgment in the amount by which respondents' contribution claim exceeded the amount owed to appellant under the stock purchase agreement of 1971; and (3) specific performance by Mr. Baldwin of the March 19 option agreement, and a declaration that Jessup Farms is legal owner of all HHR stock described in that agreement and entitled to possession of the certificates held by PCA representing those shares.

Appellant's answer denied liability and alleged that as a surety, rather than a principal obligor, she was released from liability by respondents' execution of the 1973 note which assertedly altered the 1972 note; that as assignee of Mr. Baldwin she was entitled to the proceeds of the stock purchase agreement of 1971; and that her liability terminated when she ceased to be a shareholder in HHR on June 15, 1973, the date the property settlement agreement was executed. Appellant by cross-complaint sought to recover from respondents the balance due on the stock purchase agreement of 1971, assigned to her by Mr. Baldwin, and to obtain a determination that respondents' claim to the Baldwin stock under the March 19 option agreement is subject and subordinate to the lien in her favor under the property settlement agreement.

After a court trial, the court held that Civil Code section 1479, subdivision Three, controlled with respect to allocation of the amounts paid to PCA on the promissory notes; that appellant was a principal obligor on the 1972 note (see fn. 4, *ante*); and that the 1972, 1973 and both 1974 notes were all of the same "class" within the meaning of section 1479.[6] Accordingly, the court applied all

---

[6]Section 1479 provides:

"Where a debtor under several obligations to another, does an act, by way of performance, in whole or in part, which is equally applicable to two or more of such obligations, such performance must be applied as follows:

"One—If, at the time of performance, the intention or desire of the debtor that such performance should be applied to the extinction of any particular obligation, be manifested to the creditor, it must be so applied.

"Two—If no such application be then made, the creditor, within a reasonable time after such performance, may apply it toward the extinction of any obligation, performance of which was due to him from the debtor at the time of such performance; except that if similar obligations were due to him both individually and as a trustee, he must, unless otherwise directed by the debtor, apply the performance to the extinction of all such obligations in equal proportion; and an application once made by the creditor cannot be rescinded without the consent of [the] debtor.

"Three—If neither party makes such application within the time prescribed herein, the performance must be applied to the extinction of obligations in the following order; and, if there be more than one obligation of a particular class, to the extinction of all in that class, ratably:

payments made on the four notes by respondents and HHR ratably against the various liabilities. The court further ordered appellant to contribute to respondents one-half of the amount of respondents' payments allocable to the 1972 note, less the amount respondents owed her under the stock purchase agreement of 1971, for a total of $127,838.82. (See Civ. Code, § 1432.) The court also ruled that Jessup Farms was entitled to immediate delivery and possession of the 105 shares of HHR stock which had remained in escrow under the terms of the stock purchase agreement of 1971.

Finally, the court dismissed appellant's cross-complaint with prejudice. It found that Jessup Farms was a bona fide purchaser for value of the Baldwin stock held in escrow by PCA, and that consequently it was entitled to specific performance by Mr. Baldwin of the March 19 option agreement. The court thus found that Jessup Farms purchased the Baldwin stock without notice of appellant's unperfected security interest in the stock created by the property settlement agreement. Concluding that appellant held neither a legal nor an equitable lien on the stock, the court ordered PCA to immediately deliver to Jessup Farms the Baldwin stock, representing the remaining 350 shares of HHR stock. As a result, respondents acquired ownership and possession of 100 percent of all issued and outstanding HHR stock.

## II

*Appellant's contention that she is not liable in contribution*

On appeal, appellant renews her claim—rejected by the trial court—that because payments in excess of the amount due on the 1972 note were made prior to the time respondents made the payments for which they were awarded contribution, she is not obligated to make any contribution. Thus, appellant argues, the payments made by HHR prior to January 1975 should have been first applied to extinguish the 1972 note, the only obligation for which she was a co-obligor, so that she should not have been held liable in contribution for payments made by respondent Jessup Farms on and after January 3, 1975. In support of this contention appellant makes a two-fold argument: that the four promissory notes were not of the same "class" within the meaning of Civil Code section 1479, and that this section purportedly requires that all payments be first applied to the "oldest debt," here the 1972 note. We will conclude that the trial court erred in allocating the HHR and Jessup Farms payments ratably among the several obligations comprising the PCA indebtedness and in order-

---

"1. Of interest due at the time of the performance.
"2. Of principal due at that time.
"3. Of the obligation earliest in date of maturity.
"4. Of an obligation not secured by a lien or collateral undertaking.
"5. Of an obligation secured by a lien or collateral undertaking."

ing appellant to make contribution to respondents, but not for the reasons set forth by appellant.

■■ ■■■ Both parties assert that section 1479 controls this case.[7] For present purposes the relevant portion of section 1479 is subdivision Three which provides for the allocation of unspecified payments applicable to any one of several obligations. Subdivision Three provides that where several obligations are owed and neither the debtor nor the creditor makes express application of a payment to a particular obligation within the time prescribed, the payment "must be applied to the extinction of obligations in the following order; and, *if there be more than one obligation of a particular class, to the extinction of all in that class ratably*:

---

[7]Both parties urge that if section 1479 is construed adversely to their respective interests, equity principles dictate that each of them prevail. It has been held that ". . . where none of the rules prescribed by the statute [section 1479] cover or apply to the particular situation, application of a payment will be made on common law principles. [Citations.] Payment will be applied in the manner most consonant with justice and equity. . . . (*Pike* v. *Tuttle* (1971) 18 Cal.App.3d 746, 753 [96 Cal.Rptr. 403].) The trial court held that even if section 1479 is inapplicable, a ratable allocation of payments is fair and equitable. However, our review of the undisputed facts in this case suggests that it would be inequitable to require appellant to contribute to payments on debts incurred by respondents after she was no longer a stockholder of HHR.

The right to contribution embodied in Civil Code section 1432 "rests upon principles of equity and natural justice." (*Blankenhorn-Hunter-Dulin Co.* v. *Thayer* (1926) 199 Cal. 90, 96 [247 P. 1088, 48 A.L.R. 797]; see also *Jackson* v. *Lacy* (1940) 37 Cal.App.2d 551, 559 [100 P.2d 313].) Under fundamental principles of equity, a person who has paid no more than his or her just proportion of the debt cannot secure contribution from a codebtor, even if the codebtor has paid nothing. (*Jackson, supra,* at p. 560; see also *Woolley* v. *Seijo* (1964) 224 Cal.App.2d 615, 622 [36 Cal.Rptr. 762].) As a corollary to this rule, this court has held that equality of liability among persons whose respective situations are not equal is inequitable. (*Blankenhorn, supra,* at p. 96.) Applying these principles to the present case it is manifest that the respective positions of the parties were not equal. Appellant did not sign the 1973 note as a co-obligor; she therefore did not incur personal liability for the new advances evidenced by that note. At the time the 1973 note was executed, appellant no longer owned HHR stock; all she had in the entire venture was an unperfected security interest in the stock she transferred to her ex-husband. Thus, appellant should have been liable only as to that portion of the payments which were commensurate with her proportionate interest in the venture. Moreover, she received no part of the proceeds from the first note as the money was borrowed for the benefit of the corporation. HHR spent the money borrowed on the 1972 note, and it—and not respondents—paid it back prior to the payments for which respondents seek contribution. Equitable considerations would appear to dictate that appellant not be required to contribute to obligations incurred by respondents as shareholders of HHR. Under these circumstances, Jessup Farms paid no more than what in equity and good conscience it should have paid.

We recognize, of course, that a trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. (*In re Richard E.* (1978) 21 Cal.3d 349, 354 [146 Cal.Rptr. 604, 579 P.2d 495]; *Brown* v. *Newby* (1940) 39 Cal.App.2d 615, 618 [103 P.2d 1018].) However, although we are of the view that requiring appellant to make contribution is palpably unjust, we need not ground our decision on equitable considerations. As we shall explain, the proper application of Civil Code section 1479 compels the same result. Though this is a dispute between two debtors—and not between creditor and debtor—section 1479 is applicable. In either case, the determining factor is the allocation by the creditor of unspecified payments. Because the source of the present controversy is the original allocation of the subject payments by PCA, we agree with the parties that section 1479 controls this case.

"1. Of the interest due at the time of performance.

"2. Of principal due at that time.

"3. *Of the obligation earliest in date of maturity.*

"4. Of an obligation not secured by a lien or collateral undertaking.

"5. Of an obligation secured by a lien or collateral undertaking." (Italics added; see fn. 6, *ante,* for full text of statute.)

Because each of the obligations at issue embodies both principal plus accrued interest and because there is no question regarding the application of payments as between principal and interest, subsections 1 and 2 are not here relevant. We therefore consider, *first,* whether the trial court properly held that the subject promissory notes are of the same "class" so that the unspecified payments must be apportioned ratably among all the obligations;[8] and, *second,* whether the 1972 note can be considered the "obligation earliest in maturity" under subsection 3 in light of the 1973 "renewal" note.

■ Appellant argues that the four promissory notes were not of the same class because each was executed at a different time and for a different amount and because, although HHR was the principal obligor on all the notes, each was executed by a different set of co-obligors. We are unpersuaded by this contention. Nothing in the statute supports appellant's suggestion that several obligations are only of the same class if executed on the same date and for the same amount. Moreover, although subsections 4 and 5 establish separate categories for secured and unsecured obligations, these subsections draw no distinction based upon the type of security or the number of obligors who may be bound on the instrument.

Appellant relies heavily on *Bank of America etc. Assn.* v. *Kelsey* (1935) 6 Cal.App.2d 346 [44 P.2d 617], in support of her contention that the subject notes are obligations of different classes. That case, however, is not only inapposite, but it refutes appellant's contention in dictum. The court in *Kelsey* simply held that a renewal note neither changed the underlying character of an obligation nor discharged the separate debts which it evidenced. (*Id.,* at p. 353.) Although appellant emphasizes that the underlying obligation in that case involved four promissory notes each for different amounts and with dif-

---

[8]The trial court made a conclusion of law that the constituent obligations comprising the PCA indebtedness were of the same class within the meaning of section 1479, but it did not specify whether it considered the notes to be of the same class by virtue of the fact that they were all secured under subdivision Three 5 or because it viewed them as maturing simultaneously and thereby of the same class under subdivision Three 3.

ferent execution dates, the court did not rely on these incidental differences. Rather, it concluded that the notes evidenced "two classes of obligations as defined by section 1479, . . ."—those secured vis-à-vis those unsecured. (At p. 352.) The court then allocated payments first to the unsecured debt, with the surplus being applied to the secured debt. Thus, the distinction which led the court in *Kelsey* to find two distinct classes of obligations is totally absent here as the subject notes are all secured. Further, the *Kelsey* court stated in passing that "[t]here being no item of interest involved at the time of this payment, we are led to the *second class* mentioned in subdivision Three of section 1479, which embraces 'principal due at that time'. . . ." (At p. 353; italics added.)

Thus, *Kelsey* clearly stands for the proposition—though it does not specifically so hold—that the "classes" referred to in subdivision Three are the five categories there listed. We are persuaded by the *Kelsey* dictum that subdivision Three, read as a whole, establishes by its terms that subsections 1 to 5 constitute the "classes" of obligations to be given priority for purposes of allocating unspecified payments. We conclude that the most reasonable construction of the statute compels this interpretation and, accordingly, hold that the five categories specified in subsections 1 to 5 constitute the particular classes of obligations referred to in the first paragraph of subdivision Three.[9] We therefore reject appellant's contention that the factual circumstances surrounding the execution of the notes are dispositive in determining the "class" of the obligation.

■ Having so construed the term "class" as used in section 1479, we next turn to respondent's contention that the trial court's allocation of payments ratably among the four notes must be upheld either because all the notes share a "mutual classification as secured obligations," thus making them of the same class pursuant to subdivision Three 5, or because all the notes matured on the same date thereby making them of the same class under subdivision Three 3.

No case supports the view that pro rata allocation is compelled if the notes are all secured under subsection 5. To so hold would lead to anomalous results. Because all obligations are either secured or unsecured, under respondents' analysis subsections 1 to 3 would be rendered meaningless. Accepting this statutory construction would require only an initial determination of whether the obligations are secured or not; thereafter payments will *always* be apportioned ratably in contravention of the statutorily mandated priorities. Even where the several obligations include both secured and unsecured debts, only the unsecured debts will be given preference irrespective of the first three listed statutory priorities—interest, principal, and maturity date. Clearly, these

---

[9]Of course, there may be subclasses within subsection 3, as there may be notes with different maturity dates. Any two or more instruments with the same maturity date would constitute such a subclass.

anomalous results indicate that this interpretation of section 1479 violates a fundamental principle of statutory construction: ". . . that legislation should be construed so as to harmonize its various elements without doing violence to its language or spirit." (*Wells* v. *Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 788 [176 Cal.Rptr. 104, 632 P.2d 217].)

As early as 1895, one court recognized the total unacceptability of such a statutory construction. In *The Katie O'Neil* (N.D.Cal. 1894) 65 Fed. 111, 117, the district court had occasion to interpret section 1479[10] and held that subsection 3 (date of maturity) must govern in a case where the obligations are either secured or unsecured, and that subsections 4 and 5 govern in cases where the comparison is between secured and unsecured obligations. With *Katie O'Neil* as a point of departure, we adopt a statutory construction that will best give effect to *all* the provisions of section 1479. (See *Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 114 [172 Cal.Rptr. 194, 624 P.2d 244] [statutory interpretations which produce internal harmony and accord significance to each word and phrase are preferred].)

It is readily apparent that subsections 4 and 5 seek to effectuate the oft-cited proposition that courts will first apply unspecified payments to the discharge of the most precariously secured obligations. (See, e.g., *Murdock* v. *Clarke* (1891) 88 Cal. 384 [26 P. 601]; *Walter Broderick & Associates, Inc.* v. *Monte Vista Lodge* (1967) 253 Cal.App.2d 242 [61 Cal.Rptr. 679]; *Eisendrath* v. *Bank of America* (1953) 118 Cal.App.2d 434 [258 P.2d 13]; *Bank of America etc. Assn.* v. *Kelsey, supra,* 6 Cal.App.2d 346.) This policy favoring unsecured obligations over secured ones should not, however, be implemented so as to defeat the statutorily expressed policy of giving priority in the application of unspecified sums first to interest, then to principal and, finally, to notes with the earliest maturity date. Section 1479 expressly provides that these first three classes of obligations take precedence over the more general categories for unsecured and secured debts.[11]

That statute itself, if construed to effectuate its terms, therefore does not support the view that all secured obligations require pro rata application of payments simply by virtue of being secured. Rejecting a construction that would render the statute meaningless, we therefore conclude that subdivision Three's pro rata provisions for "more than one obligation of a particular class" apply where there is more than one obligation within a particular subsection,

---

[10]At the time *Katie O'Neil* was decided section 1479 had already been amended to read as it does at present. (See Code Amends., 1873-1874, ch. 612, p. 239.)

[11]*Katie O'Neil* correctly recognized that a secured note with an earlier maturity date than an unsecured note would have priority under subsection 3 over the unsecured note (subsec. 4), notwithstanding the policy of giving less secure instruments priority.

provided that such a "class" retains its payment priority as enumerated in the statutory scheme; i.e., subsections 1 through 5 in descending order of priority. Thus, where the notes at issue have different maturity dates, section 1479 requires that payments be applied to the notes with the earlier maturity date, in order, irrespective of whether secured or unsecured. Where, however, two or more obligations have the same maturity date, section 1479 mandates a ratable allocation among them (assuming all such obligations are either secured or unsecured).[12]

■ Applying this construction to the present case, respondents can nevertheless prevail if they can establish that the promissory notes had simultaneous maturity dates so that, under subsection 3, the obligations are a "class" subject to ratable allocation.[13] (See *Star Mill and Lumber Co.* v. *Porter* (1906) 4 Cal.App. 470 [88 P. 497] [pro rata allocation of payments among mechanic lien claims maturing on the same date].)

Although conceding that the 1972 note states on its face that it is due, if no demand be made, on May 6, 1973, respondents nonetheless argue (1) that execution of the 1973 note "renewed" the due date of the first note, and (2) that the 1973 note, in turn, became due prior to its May 6, 1974, due date because of PCA's first written demand. Because PCA demanded payment of the entire debt, respondents assert that the first three notes were thus due simultaneously on March 13, 1974, the date of PCA's first demand. Respondents concede, however, that the fourth note, executed after the first demand, did not become due until PCA made its second written demand on December 30, 1974. In sum, respondents argue that payments should have been allocated among the first three notes since these, they allege, had the same maturity date.[14]

---

[12]It seems clear that subsections 4 and 5 come into play where, under subsection 3, there is more than one debt with an identical maturity date and at least one such debt is secured and one is unsecured. Thus, as a practical matter, subsections 4 and 5 are relevant only where there are secured and unsecured obligations with the same maturity date and not enough money to pay them all. In such a case, payments would be first allocated to the unsecured debt.

[13]Although our statutory interpretation of section 1479 allows respondents to nevertheless argue that the promissory notes are of the same class and subject to ratable allocation, the analytical distinctions set forth, *infra,* are not without practical significance. Had we accepted the argument that the subject notes constituted one class by virtue of being secured, respondents would have been automatically entitled to ratable allocation without need to reach the question whether the 1972 note was earliest in maturity and, as such, entitled to discharge.

[14]Based on their chronology of when the subject notes matured, respondents argue that the trial court erred in ratably applying the payments among all four notes, instead of only the first three, thereby decreasing appellant's contribution obligation with respect to the 1972 note. Although a change of theory may be permitted on appeal where only a question of law on agreed facts is involved (*Roberts* v. *Pfefer* (1970) 13 Cal.App.3d 93, 98 [91 Cal.Rptr. 308]), we need not entertain respondents' request to reallocate the payments among the first three notes since we hold that appellant is not obligated to make any contribution. In any event, we conclude, *post,* that the first three notes did *not* have the same maturity date.

■ Appellant, on the other hand, contends that payments should have been first applied to the earliest item of debt—the 1972 note. Appellant relies on misleading statements in two cases which suggest that payments must be first applied to the extinguishment of "the earliest item of debt" (*Hollywood etc. Co.* v. *John Baskin, Inc.* (1953) 121 Cal.App.2d 415, 430 [263 P.2d 665]) or "the oldest debt" (*Los Angeles T. & S. Bk.* v. *Forve* (1919) 45 Cal.App. 298, 300 [187 P. 438]). (Compare *Star Mill and Lumber Co.* v. *Porter, supra,* 4 Cal.App. at pp. 473-474 [". . . the rule given in (section 1479) is not that the payment is to be applied to the obligation earliest in date, but to 'the obligation earliest in date of maturity.'"].) Suffice it to state that section 1479 on its face repudiates appellant's erroneous contention that the statute compels application of payments to the oldest debt first: subdivision Three 3 speaks of the maturity date of the obligations and not of the order in which the obligations were incurred. The statements in *Hollywood Wholesale* and *Los Angeles Trust* either appear to contemplate obligations of earliest maturity or are mere dicta; to the extent that those cases suggest a contrary rule, they are disapproved. Accordingly, consistent with the provisions of section 1479, we reiterate the settled rule that payments should be first applied to the obligation earliest in maturity, though not necessarily the oldest obligation. (*Smith* v. *Renz* (1954) 122 Cal.App.2d 535, 538 [265 P.2d 160]; *Bradner* v. *Woods* (1939) 30 Cal.App.2d 678, 681 [87 P.2d 69]; *Ross* v. *McDougal* (1936) 12 Cal.App.2d 172, 175 [55 P.2d 574].)

■ We now turn to respondents' contention that the "nominal maturity date" of the 1972 note was renewed by virtue of the renewal provisions of the 1973 note. Relying on California Uniform Commercial Code section 3802, subdivision (1)(b),[15] respondents assert that the 1973 note, as a matter of law, renewed the maturity date of the underlying obligation—the 1972 note—until such time as the renewal note itself matured. They argue that because the two notes must be deemed to have matured simultaneously, the trial court properly declined to allocate payments to the extinguishment of the 1972 note, and thus correctly found that appellant was liable in contribution.

Respondents' contention with respect to the effect of section 3802 on the present transactions raises an issue which no California case has previously addressed, i.e., whether a new instrument renews the maturity date of an underlying obligation. The only case to date that discusses section 3802 at all does so in a context not here relevant.[16] As will appear, we conclude that although there is no decisional authority directly on point, our reading of the statute precludes reaching the result sought by respondents—that section 3802 mandates that the maturity date of the underlying obligation be renewed as a matter of law.

---

[15]All further statutory references are to the Commercial Code unless otherwise indicated.

[16]In *Canal-Randolph Anaheim Inc.* v. *Wilkoski* (1978) 78 Cal.App.3d 477 [144 Cal.Rptr. 474], the Court of Appeal held that section 3802, subdivision (1)(b), did not apply to suspend the obligation to pay rent where defendant-tenant tendered a rent check to plaintiff-landlord.

Section 3802 provides in pertinent part:

"(1) *Unless otherwise agreed* where an instrument is taken for an underlying obligation

" . . . . . . . . . . . . . . . . . . . . . .

"(b) . . . the obligation is *suspended* pro tanto until the instrument is due or if it is payable on demand until its presentment. If the instrument is dishonored *action may be maintained on either the instrument or the obligation*; . . . ." (Italics added.)[17]

Paragraph 3 of the official comment to Uniform Commercial Code section 3-802 (which is identical to our § 3802) reads: "It is commonly said that a check or other negotiable instrument is 'conditional payment.' By this it is normally meant that taking the instrument is a surrender of the right to sue on the obligation until the instrument is due, but if the instrument is not paid on due presentment the right to sue on the obligation is 'revived.' Subsection (1)(b) states this result in terms of suspension of the obligation. . . ." (23 West's Com. Code (1973 ed.) p. 503, Deering's Ann. Cal. U. Com. Code (1970 ed.) p. 391; see also 10 Cal.Jur.3d (1974) Bills and Notes, § 104, pp. 117-118.)

At the outset we observe that section 3802 is applicable only when the parties do not otherwise agree.[18] Here we are presented with an express contrary provision—the 1973 note states on its face that the parties agree that "[t]his note is executed, . . . not in payment of, but for the purpose of renewing the unpaid balances" on the 1972 note, which is specifically identified as having a maturity date of May 6, 1973. Because the operation of section 3802 is expressly conditioned on there being no agreement to the contrary, we may then properly conclude that upon execution of the new instrument the parties unequivocally expressed an intent not to renew the maturity date of the underlying obligation. Moreover, the 1972 note, by its terms, had *already* matured more than a month prior to the execution of the 1973 note. In fact, PCA could have brought suit on the 1972 note as of May 6, 1973. It is settled that an obligation "matures" when the holder of the note has a legal right to bring an action to force payment. (*Bur-*

---

[17]Subsection (a), omitted from the above quote of section 3802, subdivision (1), is inapplicable in this case because PCA, the lender here, is not a bank. Subsection (a) sets out an exception to the suspension rule in that it provides that "if a *bank* is drawer, maker or acceptor of the instrument and there is no recourse on the instrument against the underlying obligor[,]" the taking of the instrument does not result in suspension pro tanto but, rather, the underlying obligation is "pro tanto *discharged*. . . ." (§ 3802, subd. (1)(a); italics added.)

[18]In *McDowell* v. *Miller* (Mo.App. 1977) 557 S.W.2d 266, the court makes the following pertinent comment: "Does this combination of three simple words ['Unless otherwise agreed. . .'] mean what it plainly says? . . . Happily the question seems to receive an affirmative answer—at least usually." (At p. 273, fn. 7; see generally § 1201, subd. (3) ["agreement" defined]; cf. Civ. Code, § 1549 [narrower definition].)

*rill* v. *Robert Marsh & Co., Inc.* (1934) 138 Cal.App. 101, 106 [31 P.2d 823].) Thus, it does not appear that section 3802 is applicable, but even if it is, that section cannot, as we shall explain, serve to "unmature" a note that had already matured.

We recognize of course that the parties in signing the 1973 note obviously intended an extension of time in which to pay the original indebtedness evidenced by the 1972 note. The question then is whether, pursuant to section 3802, the renewal note not only suspends the underlying monetary obligation but also affects the terms of the underlying note—specifically, the maturity date thereof. We have discovered one out-of-state decision which has held, albeit in a factually dissimilar context, that under the Delaware counterpart of Uniform Commercial Code section 3-802 (5A Del. Code, § 3-802) a dishonored instrument does not change the due date of the underlying obligation. (See *Moore* v. *Travelers Indem. Ins. Co.* (Del.Super. 1979) 408 A.2d 298, 301.) Furthermore, *Bank of America etc. Assn.* v. *Kelsey, supra,* 6 Cal.App.3d 346, which, as earlier noted, held that a renewal note neither changes the underlying character of the obligation nor discharges the debts which it evidences, is helpful in this regard. In *Kelsey,* the bank held an unsecured $4,000 note and secured notes totalling $7,000. After a $1,600 payment was made, the remaining $9,400 debt was consolidated into a single note which, as in the present case, was designated a renewal note not taken in payment of the prior notes. The Court of Appeal held that under Civil Code section 1479 a second payment of $5,000 must be first applied to the unsecured portion of the total $9,400 debt—the $2,400 still owing on the $4,000 unsecured note. It is clear, therefore, that for purposes of subdivision Three of section 1479 we look to the original character of the underlying note irrespective of the execution of a subsequent renewal note. In our case we are concerned with the maturity date of the underlying note. The undisputed facts are that the 1972 note had already matured by the time the 1973 note was executed. Because under *Kelsey* the original character of the 1972 note is preserved, a fortiori the 1973 note cannot "unmature" it for purposes of Civil Code section 1479. (See also *Easton* v. *Ash* (1941) 18 Cal.2d 530, 538 [116 P.2d 433] [provisions of renewal note "cannot operate to bind (previous) instruments into a single inseparable transaction."].)

Moreover, applying section 3802 to the facts of this case, it is apparent that because the statute provides only that the underlying obligation is "suspended pro tanto"[19] until the new instrument is due or, if it is payable on demand, until

---

[19]The previously quoted comment to section 3802 makes clear that suspension of the obligation means a surrender of the right to sue on the obligation so long as the suspension remains in effect. In this regard, the comment further states that suspension of the obligation is primarily "intended to include suspension of the running of the statute of limitations." (23 West's Com. Code, *supra,* p. 503; see also *Easton* v. *Ash, supra,* 18 Cal.2d at p. 535.) We note that this purpose can readily be achieved without need to "renew" the maturity date, especially since section 3802 speaks in terms of suspension and not renewal.

its presentment (see 3 Anderson, On the Uniform Commercial Code (2d ed. 1971) § 3-802:4, p. 141), it follows that the *terms* of the underlying obligation (here maturity date) are also merely suspended until the new instrument is due. Thus, in spite of the execution of the 1973 note, appellant's obligation to PCA continued to be measured by the terms of the 1972 note, the only instrument she signed as a co-obligor.[20] Because section 3802 provides that the mere fact that a lender executes a subsequent renewal instrument does not constitute an extinguishment of the original indebtedness, the 1972 obligation (including its terms) remained a viable instrument which continued to be held by PCA. It is therefore clear that the parties who executed the 1973 note did not intend to discharge the original indebtedness since the note is expressly entitled "Renewal Promissory Note," and it specifically incorporates the balance due on the 1972 note. Accordingly, appellant's obligation remained the same under the 1973 note; "it is in substance and in fact the same indebtedness evidenced by a new promise." (*Bank of Austin* v. *Barnett* (Tex.Civ.App. 1977) 549 S.W.2d 428, 430.)

In the present case, payment was due with respect to the 1972 note, by its terms, on May 6, 1973, since no prior demand for payment was made. Assuming that pursuant to section 3802 the maturity date of the first note was suspended by execution of the 1973 note, this latter note was "dishonored" as it also was not paid upon demand. At the time payment was not presented upon demand, the underlying obligation was "revived," thus providing PCA—the holder of both notes—with the option to sue either on the new instrument or on the first note.[21] Consequently, the original maturity date of the 1972 note remained unaltered either (1) pursuant to case law as a result of the fact that an action was maintainable by PCA upon HHR's failure to comply with the demand (*Burrill* v. *Robert Marsh & Co., Inc., supra,* 138 Cal.App. at p. 106), or (2) pursuant to the "revival" provisions of section 3802 for termination of the suspension of the underlying obligation.

In sum, we are of the view that the parties to the 1973 note expressed the intent to retain the original maturity date of the 1972 note; that the underlying character of the 1972 note is preserved notwithstanding the renewal note; and, alternatively, that even if the maturity date was suspended pursuant to section 3802, HHR's failure to comply with PCA's demand revived the underlying obligation, including the due date. In any event, execution of the 1973 note ultimately had no effect on the maturity date of the first note. Thus, the maturity

---

[20]It bears emphasizing that appellant was liable only to the extent that the new note evidenced the approximate $3 million balance due on the 1972 note.

[21]Section 3802 evidences a legislative intent to provide the holder of a renewal note taken for an underlying obligation with a choice of remedies.

date on the original obligation remained unmodified or, if suspended pursuant to section 3802, was revived from the time of PCA's first written demand in March 1974, which, we note, preceded the date respondents made the first of three payments for which they were awarded contribution. We cannot agree, therefore, with respondents' assertion that the first three notes had identical maturity dates. Although at the time of its first demand PCA was entitled to demand payment on all three notes, we conclude that each note nonetheless retained its respective maturity date.

We therefore hold that the 1972 note was the "earliest in date of maturity" within the meaning of Civil Code section 1479, subdivision Three 3, and that payments made by HHR prior to 1975 should properly have been credited first to the payment of the 1972 note. Had the trial court not erred by apportioning the payments among the four notes, the 1972 note would have been completely extinguished prior to respondents' post-1975 payments for which they sought contribution. We conclude that reversal is warranted on this issue.

*Appellant's contention that she had an equitable lien on the "Baldwin stock"*

█ Appellant next contends that respondents are not entitled to ownership of the Baldwin stock (the last 350 shares of HHR stock obtained by Jessup Farms) because she had an equitable lien on that stock pursuant to the property settlement agreement. Therefore, appellant argues, the trial court erred in finding that Jessup Farms was a bona fide purchaser without notice of her alleged security interest. We disagree.

As noted in our recitation of facts, appellant retained a security interest in the stock she transferred to her husband pursuant to the property settlement agreement. Although this interest was never perfected, appellant nonetheless argues that respondent Jessup Farms had notice of her security interest when it obtained the Baldwin stock from her ex-husband Wayne. Appellant acknowledges that each of the witnesses testifying for respondents on this issue denied receiving any information concerning the security interest prior to Jessup Farms' acquisition of the Baldwin stock pursuant to the March 19 agreement. The trial court found, on this disputed evidence, that respondents obtained the Baldwin stock without notice or knowledge of any claimed security interest.

Thus, appellant's second contention—that she has an equitable lien on the stock and that respondents are not bona fide purchasers—is nothing more than an attack on the sufficiency of the evidence to support the trial court's conclusions that the March 19 option contract is specifically enforceable, and that respondents should take the Baldwin stock free and clear of appellant's purported security interest. We conclude that the trial court's findings are supported by substantial evidence.

The critical issue here is whether respondents, Jessup Farms or the individual Jessups, are chargeable with constructive notice of the claimed security interest. In this regard, appellant places great reliance on a passage in a letter from counsel for HHR to an Idaho attorney representing Mr. Baldwin. A copy of this letter was sent to one of the senior partners and to the accountant of Jessup Farms. Appellant argues that the receipt of the letter by one of the Jessups compels the conclusion that respondents were on notice of her claimed security interest. The letter itself belies this contention.

The crucial passage, as underscored by appellant herself, is a statement by HHR's attorney that ". . . it was my instruction as well as those of Webster Jessup, president of the corporation, and Burke Dambley, corporation C.P.A., that the contract [a rescinded redemption agreement not here relevant] was not to be considered properly signed until unconditionally signed by Eileen Baldwin, who has a *one-half community property interest in Wayne's stock* in the corporation, . . ." (Italics added.) This passage, at most, indicates that at the time the letter was received the Jessups were still operating under the assumption that appellant held a community property interest in the stock, a fact they probably had always assumed. This letter therefore does not persuade us to disturb the trial court's findings since it in no way supports the conclusion that the Jessups had notice, actual or constructive, that appellant had transferred her community property interest in the stock to Mr. Baldwin pursuant to a property settlement agreement and had taken in exchange a security interest in the stock to secure performance of Mr. Baldwin's other obligations under the agreement.

Even if we were to draw some inference favorable to appellant from this single evidentiary item, the quoted passage at best creates a conflict in the evidence. The fact that it is possible to draw some inference other than that drawn by the trier of fact is of no consequence. (*Forte* v. *Nolfi* (1972) 25 Cal.App.3d 656, 667 [102 Cal.Rptr. 455].) Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often over-looked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court. (*Ibid.*; *Bandle* v. *Commercial Bk. of Los Angeles* (1918) 178 Cal. 546, 547 [174 P. 44]; see also *Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619]; *Munoz* v. *Olin* (1979) 24 Cal.3d 629, 635 [156 Cal.Rptr. 727, 596 P.2d 1143]; 6 Witkin, Cal. Procedure (2d ed. 1971) §§ 247, 248, pp. 4239-4240.)

Applying this familiar standard of appellate review, we conclude that the challenged findings in this case are supported by substantial evidence—notably the testimony of some of the Jessups and their accountant that they had no knowledge of appellant's claimed security interest prior to entering into the option contract with Mr. Baldwin. The trial court's findings are binding on appeal; accordingly, we cannot disturb its conclusion, reached after hearing all the evidence, that respondents had no constructive notice of appellant's unperfected interest.[22] The judgment giving Jessup Farms absolute ownership and possession of the Baldwin stock must be upheld.

### III

For the aforementioned reasons, we reverse that portion of the judgment ordering appellant Eileen Baldwin to make contribution to Jessup Farms. That portion of the judgment ordering specific performance of the option contract between respondents and Wayne Baldwin and denying appellant's cross-complaint for an equitable lien on the stock transferred pursuant to that contract is affirmed.

Each party shall bear its own costs on appeal.

Bird, C. J., Mosk, J., and Broussard, J., concurred.

**KAUS, J.**—I concur entirely in the court's opinion concerning appellant's claim to an equitable lien in the "Baldwin stock." I also concur in the result as far as respondents' claim for contribution is concerned. It seems to me, however, that it would be better to reach this result by the application of equitable principles—as mooted in footnote 7 of the court's opinion—than by exegeses of sections 1479 of the Civil Code and 3802 of the California Uniform Commercial Code which are not called for by the facts of this case.

Section 1479 of the Civil Code is obviously designed to help settle disputes between debtors and creditors. This case, though, is nothing of the sort; it is a claim for contribution among debtors, which the court settles by determining how a hypothetical dispute between the debtors and the creditor would have ended. Just why the equities between the parties before us should be governed by the result of a dispute that never arose is hard to see. It has always been recognized that even as between debtor and creditor, section 1479 provides only guidelines for the application of equitable principles. In *Murdock* v. *Clarke* (1891) 88 Cal. 384 [26 P. 601], the very first case to consider section 1479, this

---

[22]The trial court further found that even if respondents had knowledge of the claimed interest, the stock was nonetheless free from any security interest because appellant released the lien by authorizing delivery of the endorsed stock certificates to the PCA escrow for the ꞁ rpose of implementing the March 19 agreement.

court said with respect to the section: "No specific rule can be laid down that will embrace all the cases that may arise for its application, inasmuch as the infinite variety of human transactions cannot be included within the limits of a formulated rule; and therefore courts must be governed by principles rather than by fixed rules. In this state an attempt has been made for the guidance of courts in this matter, but the rules there prescribed are insufficient for all occasions, and do not embrace even the conditions of the present case. . . ." (88 Cal. at p. 391.) I believe that this, too, is a case for which no specific rule has been laid down and that, therefore, we should look to equitable principles to determine whether respondents are entitled to contribution.

Applying such principles, I believe it is clear that no contribution is called for. I summarize my reasons:

1. The somewhat murky oral "apportionment agreement" between the Baldwins and the Jessups to the effect that personal liability would be apportioned in accordance with stock ownership in HHR clearly absolves appellant. As of the time of the agreement she owned no stock in HHR. That the agreement applied not only as between the Baldwins on one side and the Jessups on the other, but also between the Baldwins *inter se,* is evidenced by the fact that Mr. Baldwin signed the 1973 note in his individual capacity, but appellant only as treasurer of HHR.

2. Even without the apportionment agreement, equity demands that as between appellant and the Jessups, the latter be primarily liable on all indebtedness incurred after appellant divested herself of any legal interest in HHR by her property settlement agreement. I agree that in view of the trial court's findings we must accept her individual liability on the 1972 note. There is, however, no equitable reason for failing to distinguish between that note which was signed at a time when appellant was still a stockholder in HHR and the 1973 note, given when her only connection with HHR was that of an officer and the holder of an unperfected security interest in her husband's stock.

3. The logical consequence of respondents' claim is that as between themselves and appellant they could unilaterally determine how much of each payment to PCA was to be credited to the 1972 note. Each new debt to PCA incurred by HHR diluted that credit, although appellant had no voice in determining that such a debt should be incurred. Theoretically, respondents would have been in a position to make the portion of any payment to be credited to the 1972 note diminish to the vanishing point by the simple device of borrowing more money—at a price, of course—and using the proceeds of the new loans to repay the total indebtedness. There is, of course, no evidence that this was done; further, the scheme assumes an unproven readiness on the part of PCA to go on lending money. Nevertheless, the mere possibility of such a unilateral "water-

ing'' of appellant's contribution demonstrates the inequity of respondents' position.

Richardson, J., concurred.